# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2010-DP-00510-SCT

*BOBBY BATISTE a/k/a BOBBY L. BATISTE a/k/a*
*BOBBY L. BATISTE, JR. a/k/a BOBBY LIONEL*
*BATISTE, JR. a/k/a BOBBY LIONEL BATISTE*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/31/2009 |
| TRIAL JUDGE: | HON. JAMES T. KITCHENS, JR. |
| COURT FROM WHICH APPEALED: | OKTIBBEHA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: ALISON R. STEINER |
| | JAMES LAPPAN |
| | ANDRE DE GRUY |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JASON L. DAVIS |
| | MARVIN L. WHITE, JR. |
| DISTRICT ATTORNEY: | FORREST ALLGOOD |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 05/16/2013 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CHANDLER, JUSTICE, FOR THE COURT:**

¶1.     Bobby Batiste was convicted of capital murder with the underlying felony of robbery

for the slaying of his roommate, Andreas Galanis. After a sentencing hearing, the jury

determined that Batiste should suffer the death penalty. The Circuit Court of Oktibbeha

County denied Batiste's post-trial motions. Now Batiste has appealed, raising fifteen

assignments of error. After carefully reviewing the record and Batiste's arguments, we find that no reversible error occurred. Therefore, we affirm Batiste's conviction and sentence.

**FACTS**

¶2. Batiste, Galanis, and Jaewoo Joo were Mississippi State University students who shared an apartment at Ace 21 Apartments, an apartment complex in Starkville, Mississippi. Their apartment had four bedrooms situated off a common area that included a dining area, living room, kitchen, and laundry area. Each tenant had a key that opened the front door of the apartment and that particular tenant's bedroom door.

*Events of March 6, 2008*

¶3. The following events culminated in Deputy Charlie McVey's discovery of Galanis's body inside the shared apartment. On March 6, 2008, at about 1:30 or 1:40 p.m., Galanis and Batiste went to a branch of the Merchants and Farmers Bank in Starkville. A teller, Aloysius Rice, waited on Galanis, who had a checking account at the bank. Galanis cashed a $200 check and asked Rice for the balance on his account. Rice gave Galanis a one-hundred-dollar bill and five twenty-dollar bills. Rice noticed that there were a lot of debit-card transactions on the account. Rice testified that Galanis was shocked about the debit-card transactions because he did not use his debit card. Rice testified that Batiste seemed very concerned and empathetic.

¶4. Galanis spoke with Candace Dailey, a customer-service representative, about the unauthorized debit-card transactions. Dailey testified that Galanis and Batiste sat across from her desk; they were elbow to elbow. Galanis told her someone was taking money out of his account, he had never activated his debit card, and his debit card was in his apartment in a

2

box. After Dailey reported Galanis's debit card as stolen, Dailey and Galanis went over the transactions together and discovered that the total amount missing from Galanis's account was $4,507.54. Dailey testified that Batiste was behaving like a supportive friend. Galanis left to go to class but promised to return.

¶5.     Dailey and Rice testified that Galanis returned briefly with a young Asian man and again discussed the unauthorized debit-card transactions.[1] At 3:30 p.m., Galanis returned alone and waited to talk to Dailey, who was with another customer. A teller, Shannon Watson, observed that Galanis was agitated. Galanis told Dailey that Batiste had admitted that his girlfriend had been using Galanis's debit card. Galanis had demanded that Batiste return the money by tomorrow, but Batiste had responded that that was impossible. Galanis told Dailey he wanted to file a police report and press charges, and he left the bank just after 4:00 p.m.

¶6.     Watson testified that, when she left the bank for the day at about 4:10 or 4:15 p.m., she observed Galanis and Batiste in the parking lot having a heated argument. Each was standing next to his parked car, and a cement barrier was between the cars. Watson said Galanis was speaking loudly and exhibited angry body language, and Batiste was listening.

¶7.     Rice testified that Batiste returned to the bank lobby between the hours of 4:00 p.m. and 5:00 pm. and asked how long the bank kept ATM video images. When Rice responded that the images are kept for up to a year, he heard Batiste say, "Dog."

¶8.     Deputy Steven Woodruff of the Oktibbeha County Sheriff's Department testified that,

---

[1] Presumably, the Asian man was Galanis's other roommate, Jaewoo Joo. Joo did not testify because he had returned to his home country of South Korea by the time of trial.

3

at about 5:00 p.m., Galanis made a complaint at the sheriff's department to the effect that he had noticed money missing from his checking account.

*Events of March 7, 2008*

¶9. The next day, March 7, 2008, was the Friday before spring break. Galanis's mother testified that Galanis had planned to drive home to Biloxi, and then fly to Florida for a spring-break trip. When she did not hear from Galanis, she called the Oktibehha County Sheriff's Department and asked for a deputy to go to Ace 21 Apartments to check on him. That afternoon, shortly before 5:00 p.m., McVey went to Ace 21 Apartments in response to the call.

¶10. McVey testified that, when he arrived at Galanis's building, many students were packing up and leaving for spring break. Batiste was standing next to a green Ford Explorer that was backed up to the sidewalk in front of the building. The Explorer's rear hatch door was open. McVey told Batiste that he was there to check on Galanis. Batiste, who was smiling and seemed to be in a good mood, said "well, that's my roommate." Batiste told McVey that Galanis had left that morning with a friend, who was going to drive him to Biloxi. Batiste pointed to Galanis's car, and said that it was broken down.

¶11. McVey called the sheriff's department to report what he had learned, and was instructed to check the apartment physically for Galanis. McVey knocked on the door of the apartment, and Batiste let him in. It was very dim inside. McVey asked Batiste which bedroom belonged to Galanis, and Batiste pointed out Bedroom D, which was locked. McVey called the apartment's office to get a key. He observed that Batiste was acting normally.

4

¶12. When McVey arrived at the office, Batiste abruptly pulled up in his Explorer. McVey asked Batiste to wait and let him back into the apartment. Batiste asked, "Am I a suspect?" McVey said "no," that he was there to locate Galanis. After McVey got the key, Batiste sped back to the apartment. When McVey arrived, Batiste let him inside the apartment. With Batiste standing behind him, McVey unlocked the door to Bedroom D. He immediately saw a large pool of blood at the end of the bed. McVey testified that, at that point, he knew that everything Batiste had told him was a lie. He placed Batiste under arrest and called for backup.

¶13. Deputies Ford and West arrived and opened the door of Bedroom B, the unrented bedroom. They discovered the body of Galanis wrapped in blankets inside a wheelbarrow. Search warrants were obtained for Batiste's apartment, vehicle, and person. Batiste was transported to the Oktibehha County Hospital, where Casey Hill, a registered nurse, took samples from his body and prepared a kit. Hill noticed no injuries on Batiste, but he had a blood spot on his leg.

*Autopsy*

¶14. Forensic pathologist Dr. Stephen Hayne testified that the autopsy revealed that Galanis had sustained approximately thirty-six separate external injuries inflicted with a blunt object. The cause of death was cranial cerebral trauma. Galanis's face was severely bruised and abraded from numerous instances of blunt-force trauma. He had been struck numerous times in the face and head, and his hands had injuries consistent with defensive posturing. A blow to the upper left scalp had fractured Galanis's skull. He had sustained multiple fractures to the left side of the skull and to the base of the skull. His right orbital plate was

5

fractured, and he had severe trauma to the brain.

*Batiste's Statements*

¶15.    After his arrest, Batiste gave two statements at the sheriff's department. He gave the first statement to Sheriff Dolph Bryan and Deputy Arthur Sallis. Bryan advised Batiste of his rights and Batiste signed a rights-waiver form. Batiste said that he was a criminal-justice major and he understood his rights and wanted to waive them. Batiste related his version of events to Bryan, who wrote down what Batiste said, then read it back to him and allowed him to make corrections. Batiste read and signed each page of the written statement, and Bryan and Sallis signed each page.

¶16.    Batiste's two statements were similar. According to the first statement, Batiste had used Galanis's debit card with his permission, except for two charges. He stated that, the night before, he and Galanis had reached an agreement for Batiste to repay the money. Batiste had stayed at his girlfriend's house that night. When he returned the next morning, Galanis became angry about the missing funds. Galanis came into his room, "got in [his] face," and hit his arm. Galanis threatened to get a gun and shoot Batiste in the head. Then, Galanis took Batiste's katana sword, pointed it at Batiste, and called him a "black bitch." Galanis said "f— you" and jabbed the sword at Batiste, before retreating into his own room with Batiste's sword. Batiste got his rim adaptor[2] out of his Explorer, put it in his book bag, went into Galanis's room, and said "what was that [you were] saying." Galanis jabbed at him with the sword again, and Batiste hit him with the book bag, knocking the sword out of his hand. When Galanis bent down to get the sword, Batiste hit him again. Batiste claimed that

---

[2] The rim adaptor was a gear-shaped heavy metal object.

6

he struck Galanis three or four times. Batiste said he realized that Galanis was having a hard time breathing and he started to call 911. However, he was scared, so, instead, he bought the wheelbarrow and cleaning supplies "to try to cover up the crime but it just didn't work out."

¶17.    A short time later, Batiste gave a videotaped statement to Sallis and McVey. Sallis read Batiste his rights, and Batiste indicated he understood and signed a rights-waiver form. Here Batiste provided additional details. He said that Galanis had come into his room cursing and had hit Batiste's hand. They began arguing, and Galanis said he would get a gun and shoot Batiste in the head. Then, Galanis grabbed the sword, said "f---- you, you black bitch," and jabbed it at Batiste. Batiste got the rim adaptor from his truck, put it in his book bag, and went to his own room. Galanis was still talking, and Batiste said "what's that you've been saying again?" Galanis said "you heard, me, m-----f-----" and jabbed at him with the sword. Batiste knocked it out of his hand with the book bag, then struck Galanis in the head with the book bag. Galanis bent over to pick up the sword, and Batiste hit him over the head again. Galanis got back up, and Batiste hit him again. Galanis fell down, and Batiste hit him a fourth time. Although Galanis was severely injured, Batiste was afraid to call 911, so he left Galanis inside Galanis's bedroom with the door closed and went to his girlfriend's house. This was at about 9:25 a.m. He returned at about 11:00 a.m. and checked on Galanis, who had not moved. He "panicked" and began a clean-up effort. Batiste bought a wheelbarrow, paint, cleaning fluid, and towels. He wrapped up the body and put it in the wheelbarrow in the empty bedroom. Batiste admitted that he removed Galanis's wallet from his body. He put his own clothes, the wallet, the book bag, and rim adaptor in a bag and put the bag in his truck. He was about to put the body in the truck when he was interrupted by McVey.

7

¶18.    Deputy Brett Watson testified that the apartment bore evidence of a clean-up effort. Investigators found bottles of cleaning fluid, a Rug Doctor carpet-cleaning machine, a paint tray with paint and a paint roller, and bloody rags and towels in the apartment. The Rug Doctor had blood leaking out of it. Several dark spots were on the living room carpet; the pad and concrete slab underneath were blood-stained. In Galanis's bedroom, blood was in the doorway and a very large blood stain was between the foot of the bed and closet. There were bloodstains throughout the room, with fresh paint thinly covering some of the stains on the walls. A bloody buckle from a book bag was found in Galanis's bedroom. Testing showed the blood found in the Rug Doctor and in the apartment was Galanis's.

¶19.    Deputy Watson testified that a katana sword was inside the Ford Explorer. A quilt was laid in the rear cargo area, and an empty gas can was in the rear passenger area. A black bag in the back seat of the Ford Explorer contained Galanis's wallet, which had no cash or debit or credit cards inside. The bag also contained blood-spattered bank statements of Galanis's checking account, a set of shoes, a T-shirt with vomit on it, a large rim adaptor with blood on it, a bloody book bag with a missing buckle, a study guide with Batiste's name on it, bloody clothing, and a tire iron with blood and hair on it. Testing revealed that the blood on the tire iron, rim adaptor, and book bag belonged to Galanis.

¶20.    Additionally, Galanis's Visa credit card was inside a black jacket found in the kitchen area. On the kitchen counter was a receipt for paint from Sherwin Williams. Galanis's checkbook and car keys were found in Batiste's bedroom. The search of Batiste's person revealed Galanis's debit card, receipts dated that day from Piggly-Wiggly, Dollar General,

and Sears, and receipts for prior purchases with Galanis's debit card. The Dollar General receipt was for cleaning fluids and washcloths, totaling $9.10, for which Batiste had paid $20 in cash on March 7, 2008, at 11:42 a.m.

¶21. Hewitt Rogers, a Sherwin Williams employee, testified that he had waited on Batiste at about 12:45 p.m. on March 7, 2008. Batiste had a sheetrock sample and wanted custom-matched paint to cover up stains. He also wanted a wheelbarrow, so Rogers referred him to Sears. Batiste left to get the wheelbarrow; when he returned, he was in a hurry, and paid $47 in cash for the paint and a roller kit. Havest Glover, an employee of Sears, testified that he sold the wheelbarrow to Batiste at about 12:45 p.m. on March 7, 2008. Batiste tendered $100 in cash for the wheelbarrow, which cost $85.59. Nicole May, a Piggly-Wiggly employee, testified that a black male had called at 3:30 p.m. with numerous questions about carpet cleaners. At about 4:00 p.m., Batiste rented a Rug Doctor and bought carpet cleaning fluid from Piggly-Wiggly. Batiste paid with Galanis's Visa credit card.

*Batiste's Trial*

¶22. Batiste was indicted for capital murder with the underlying felony of robbery. He did not testify at the trial. The trial court instructed the jury on capital murder with the underlying felony of robbery, murder, and self-defense. The jury found Batiste guilty as charged. After a sentencing hearing, the jury found beyond a reasonable doubt that Batiste had actually killed, had attempted to kill, had intended that a killing take place, and had contemplated that lethal force would be employed. The jury found the following aggravating circumstances beyond a reasonable doubt: the capital murder was committed during the commission of a robbery, the capital murder was committed for the purpose of avoiding arrest, and the capital

9

murder was especially heinous, atrocious, and cruel. The jury further found after weighing the mitigating circumstances and the aggravating circumstances that the mitigating circumstances did not outweigh the aggravating circumstances and that Batiste should suffer the penalty of death. Accordingly, the trial court sentenced Batiste to suffer death by lethal injection until death is pronounced.

## **ISSUES**[3]

I.  Whether the jury was erroneously instructed that it could convict Batiste of capital murder without finding that Batiste had any intent to rob Galanis at all.

II.  Whether the trial court erred in refusing to require the State to provide adequate notice to Batiste – either in the indictment or when requested thereafter – regarding the specific property that was the object of the robbery alleged as the capitalizing crime.

III.  Whether the foregoing errors were exacerbated and made even more prejudicial by the trial court's constitutionally erroneous denial of Batiste's remaining jury instructions pertaining to robbery.

IV.  Whether as a consequence of the trial court's erroneous rulings, proof of robbery at trial was insufficient to establish the robbery element of capital murder in a statutorily or constitutionally requisite fashion.

V.  Whether the trial court also committed reversible error in its other instructions to the jury at the culpability phase.

VI.  Whether the jury selection process was constitutionally infirm and reversal of Batiste's conviction and death sentence is therefore required.

VII.  Whether reversal is required for the erroneous and unconstitutional admission of certain evidence against Batiste at the culpability phase of the trial.

VIII.  Whether the trial court erred in sua sponte ordering that the jury be rewarded for its verdict of guilt with a special dinner and special activities during the break between that verdict and the sentencing phase of the trial.

---

[3] The issues are listed verbatim from Batiste's brief.

IX.     Whether over Batiste's objection, the State improperly cross-examined his sentencing phase witness with, and offered rebuttal testimony about, inadmissible prior bad acts allegedly committed by Batiste.

X.      Whether the victim impact testimony presented violated the Eighth and Fourteenth Amendments and should not have been admitted.

XI.     Whether the trial court erred in refusing the Defendant's proposed penalty phase instructions and relying instead on a single omnibus instruction submitted to it by the State that was deficient without the refused instructions.

XII.    Whether all of the aggravating circumstances on which the jury was instructed were either legally or factually unsupported, and Batiste's death sentence therefore invalid.

XIII.   Whether the death sentence in this case must be vacated because it was imposed in violation of the constitution of the United States.

XIV.    The death sentence in this matter is constitutionally and statutorily disproportionate.

XV.     The cumulative effect of the errors in the trial court mandates reversal of the verdict of guilt and/or the sentence of death entered pursuant to it.

¶23.    We have restated or combined several of Batiste's issues for the purposes of this opinion.

## STANDARD OF REVIEW

¶24.    "[T]his Court applies heightened scrutiny to capital-murder convictions where a sentence of death has been imposed." *Fulgham v. State*, 46 So. 3d 315, 322 (Miss. 2010) (citing *Bishop v. State*, 812 So. 2d 934, 938 (Miss. 2002)). "Under this method of review, all doubts are to be resolved in favor of the accused because 'what may be harmless error in a case with less at stake becomes reversible error when the penalty is death.'" *Moffett v. State*, 49 So. 3d 1073, 1079 (Miss. 2010) (quoting *Loden v. State*, 971 So. 2d 548, 562 (Miss. 2007)).

## LAW AND ANALYSIS

*Guilt Phase*

I. WHETHER THE JURY WAS ERRONEOUSLY INSTRUCTED THAT IT COULD CONVICT BATISTE OF CAPITAL MURDER WITHOUT FINDING THAT BATISTE HAD ANY INTENT TO ROB GALANIS AT ALL.

> A. *Written Instructions: Felonious Intent.*

¶25. Batiste was convicted of capital murder with the underlying felony of robbery. The robbery was shown by Batiste's admission that, after he killed Galanis, he took his wallet; he also removed his car keys, his Visa card, his checkbook, and cash that, considering Galanis's recent withdrawal of $200, reasonably may be inferred to have been inside the wallet. Batiste argues that the jury was not properly instructed on the crime of robbery. He contends that the trial court erred by granting the State's proffered robbery instruction and denying Batiste's proffered robbery instruction. In determining whether the trial court erred in the grant or denial of jury instructions, this Court reads the instructions as a whole. *Fulgham v. State*, 46 So. 3d 315, 323 (Miss. 2010). "When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found." *Id.* (quoting *Edwards v. State*, 737 So. 2d 275, 305 (Miss. 1999)).

¶26. The State's robbery instruction, SGP-4, stated:

> The Court instructs the Jury that Robbery, as mentioned in these instructions, is defined as unlawfully, willfully, and feloniously taking, stealing and carrying away some property from the presence of another person; either by violence to the person or by threats and intimidation.

Batiste's proffered robbery instruction, D-34, stated:

> For you to find Bobby Batiste committed robbery upon Andreas Galanis as charged in the indictment, you must find from the evidence in this case beyond a reasonable doubt that:

12

1. Bobby Batiste, on or about the 7th day of March 2008 in Oktibbeha County;

2. willfully took personal property of Andreas Galanis;

3. from his person or in her [sic] presence; and

4. against Andreas Galanis's will;

5. by violence toward Andreas Galanis; and

6. *at the time, Bobby Batiste had the intent to permanently deprive Andreas Galanis of the property.*

If, on the other hand, the prosecution has failed to prove any of the above listed elements to you beyond a reasonable doubt, then you shall find Bobby Batiste not guilty [of] capital murder as charged in the indictment.

(Emphasis added.) Batiste argues that instruction SGP-4 was defective because it did not properly instruct the jury that the State had to prove Batiste had the intent to rob Galanis.[4] He contends that his requested instruction properly stated the intent element because it required the jury to find that, at the time Batiste took Galanis's personal property, Batiste had the intent to deprive Galanis permanently of the property.

¶27. The crime of robbery is defined as follows: "Every person who shall feloniously take the personal property of another, in his presence or from his person and against his will, by violence to his person or by putting such person in fear of some immediate injury to his person, shall be guilty of robbery." Miss. Code Ann. § 97-3-73 (Rev. 2006). We have stated

---

[4] We note that, although Batiste did not object to the grant of SGP-4, his proffer of an alternative robbery instruction preserved this issue for appeal. *Ballenger v. State*, 667 So. 2d 1242, 1252 (Miss. 1995) (quoting *Gray v. State*, 472 So. 2d 409, 416 (Miss. 1985) (*abrogated on other grounds by Willie v. State*, 585 So. 2d 660 (Miss. 1991)).

that the elements of robbery are "that the defendant: (1) feloniously took (2) the personal property of another (3) in his presence or from his person and (4) against his will, (5) by violence to his person or by putting such person in fear of some immediate injury to his person." *Fulgham v. State*, 46 So. 3d 315, 323-24 (Miss. 2010). Certainly, the intent to rob (felonious intent) is an essential element of capital murder with the underlying felony of robbery. *Gillett v. State*, 56 So. 3d 469, 492 (Miss. 2010). The question before us is whether the jury was properly instructed on that element.

¶28. Instruction SGP-4 stated that the jury could find Batiste guilty of robbery if it found that he unlawfully, willfully, and feloniously took Galanis's property by violence. Unlike Batiste's proffered instruction, instruction SGP-4 did not inform the jury that it had to find Batiste intended to permanently deprive Galanis of his property. Citing *Croft v. State*, 992 So. 2d 1151, 1157-58 (Miss. 2008), Batiste argues that, because robbery is a specific-intent crime, the robbery instruction had to require the jury to find that, when he took Galanis's personal property, he did so with the intent to permanently deprive him of the property.

¶29. This Court resolved this issue in *Wales v. State*, 73 So. 3d 1113 (Miss. 2011). In *Wales*, the defendant requested, and was denied, an armed-robbery jury instruction stating that "the State [has] to prove, beyond a reasonable doubt, that the defendant took the personal property of another with the intent to permanently deprive that person of their property." Like Batiste, Wales relied on *Croft*. In *Croft*, the defendant had argued that, when he took money at gunpoint, he was in fact reclaiming his own gambling proceeds. *Croft*, 992 So. 2d at 1157-58. This Court held that "the State [was] required to prove that the defendant took the personal property of another with the intent to permanently deprive that person of his

14

property." *Id.* at 1157. In *Wales*, this Court distinguished *Croft*, and held that "a jury instruction defining felonious intent as the intent to deprive the victim permanently of his or her property is necessary only when there is an issue as to whether the defendant had the intent to permanently deprive the victim of his or her property." *Wales*, 73 So. 2d at 1124-25. We stated:

> [I]n this case, there was "no uncertainty that [Wales] intended to permanently deprive" the victims of their personal property. Wales's defense theory did not call into question his intent in taking the property. The jury instructions charged that the jury could convict Wales if it found he did willfully, unlawfully, intentionally and feloniously take or attempt to take the property of Michael and Owens. The jury instructions adequately instructed the jury on the element of felonious intent, and this issue is without merit.

*Id.* at 1124-25 (citation omitted).

¶30. Batiste argues that he was entitled to instruction D-34 because his defense to robbery was that he took Galanis's property after his death with the intent to conceal the killing, not with the intent to permanently deprive Galanis of the property. This argument is specious. Taking property to conceal a killing does not negate felonious intent. Batiste admitted that he killed Galanis and then removed items from his person or presence. Because Galanis was dead, Batiste could not have intended to return the items to Galanis. As in *Wales*, Batiste's defense theory created no uncertainty that Batiste intended permanently, rather than temporarily, to deprive Galanis of his personal property when he removed it from his dead body and his bedroom. Therefore, Batiste was not entitled to instruction D-34. Further, instruction SGP-4 properly set out the element of felonious intent by requiring the jury to find Batiste "unlawfully, willfully, and feloniously" took, stole, or carried away the property. The jury was properly instructed on the elements of robbery.

15

## B.    Written Instructions: Nexus Between Killing and Robbery

¶31.    Batiste stated in his confession that he killed Galanis during a fight, left the apartment for approximately an hour and a half, and then returned and began his clean-up effort. During the clean-up effort, he removed Galanis's wallet and other personal items. Other evidence showed that Batiste used Galanis's cash and credit card to purchase cleaning supplies with which to conceal the crime. Batiste argues that this evidence showed that he was guilty of deliberate-design murder because, at the time he killed Galanis, he had lacked the intent to rob him, and that he was entitled to jury instructions to that effect.

¶32.    Specifically, Batiste argues that the trial court should have reformed D-34 to instruct the jury that, if he lacked the intent to rob when he killed Galanis, he was not guilty of capital murder, but guilty only of deliberate-design murder. *See **Miss. Valley Silica Co., Inc. v. Eastman***, 92 So. 3d 666, 671 (Miss. 2012) (holding that "[w]hen a party submits a jury instruction on an important issue not covered in the other instructions, it is the trial court's ultimate duty to instruct the jury properly"). He further argues that the trial court erred by denying his proffered jury instructions D-36 and D-37. Instruction D-36 stated that the jury could not find Batiste guilty of capital murder unless Batiste had formed the intent to rob *before* Galanis died. Instruction D-37 stated that the jury could not find Batiste guilty of capital murder unless "the conduct which caused death was a natural probable consequence of the robbery itself."

¶33.    For this Court to adopt Batiste's arguments, we would have to abandon settled law governing capital-murder convictions.  Mississippi Code Section 97-3-19(e) states that "the killing of a human being without the authority of law by any means or in any manner shall

16

be murder . . . [w]hen done with or without any design to effect death, by any person engaged in the commission of the crime of . . . robbery." Miss. Code Ann. 97-3-19(e) (Rev. 2006). Mississippi follows the "one-continuous-transaction" rule for determining whether the evidence establishes the requisite nexus between the killing and the underlying felony to constitute capital murder. *Gillett v. State*, 56 So. 3d 469, 492 (Miss. 2010). "[W]here the two crimes [e.g., murder and robbery] are connected in a chain of events and occur as part of the *res gestae*, the crime of capital murder is sustained." *Id.* (quoting *Pickle v. State*, 345 So. 2d 623, 627 (Miss. 1977)). Regarding the underlying felony of robbery, "[i]f the intervening time between the time of the murder and the time of taking of the property formed a continuous chain of events, the fact that [the victim] was dead when he took the property [cannot] absolve the defendant from the crime of robbery." *West v. State*, 463 So. 2d 1048, 1055-56 (Miss. 1985) (quoting *Cobern v. State*, 273 Ala. 547, 142 So. 2d 869, 871 (1962)); *Hightower v. State*, 901 P.2d 397, 402 (Wyo. 1995) ("the time sequence of the felony and the murder is not important as long as the evidence and its inferences demonstrate one continuous transaction"). The State need not prove the defendant had the intent to rob prior to the killing. *Gillett*, 56 So. 3d at 492; *Francis v. State*, 463 S.E. 2d 859, 860-61 (Ga. 1995) ("[w]here . . . the evidence is sufficient to authorize a finding that the theft was completed after force was employed against the victim, a [felony-murder] conviction . . . is authorized 'regardless of when the intent to take the victim's [property] arose . . . .'") (citations omitted). Rather, the State has the burden to prove that "the two crimes are connected in a chain of events and occur as part of the *res gestae*." *Id.* (quoting *Pickle*, 345 So. 2d at 627).

¶34.    In *Spicer v. State*, 921 So. 2d 292, 317 (Miss. 2006), "[t]he fact that the actual

moment of the victim's death preceded consummation of the underlying felony does not vitiate the capital charge." Accordingly, in *Spicer*, we approved of the following instruction:

> This Court instructs the Jury that in a case of Capital Murder the fact that the victim was dead at the time of taking his property does not mitigate against the conclusion of robbery. If the intervening time between the murder, if any, and the time of the taking of the property, if any, formed a continuous chain of events, the fact that the victim was dead when the property was taken cannot absolve the Defendant from the crime. If you should find from the evidence in this case beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence that the Defendant, Freddie Spicer, Jr., killed and murdered Edmond Hebert and then, after the said Edmond Hebert was dead, took his property; and if you should further find beyond a reasonable doubt that the intervening time of the murder, if any, and the time of the taking of the property, if any, formed a continuous chain of events, the fact that Edmond Hebert was dead when the property was taken does not absolve the Defendant from the crime of Capital Murder.

*Id.* at 315 n.8.

¶35.    In this case, the trial court gave the following instruction on capital murder:

> The Court instructs the jury that if you find from the evidence beyond a reasonable doubt, that the defendant, BOBBY BATISTE, did on or about March 7, 2008, unlawfully, willfully, and feloniously kill and murder Andreas Galanis, a human being, with or without the deliberate design to effect death, while engaged in the commission of the crime of Robbery, without authority of law and not in necessary self-defense, then you shall find the defendant guilty as charged of Capital Murder.
> If the State has failed to prove any of the above elements beyond a reasonable doubt, then you shall find the defendant not guilty.

The trial court correctly instructed Batiste's jury on the one-continuous-transaction rule as follows: "The Court instructs the jury that the phrase 'while engaged in the commission of' includes the attempt to commit the crime, the completed crime, as well as the immediate post crime acts of the defendant so connected to the homicide as to become a part of it." As discussed below in our analysis of the sufficiency of the evidence, a rational juror could find

beyond a reasonable doubt that Batiste's killing of Galanis and removal of his property in order to conceal the killing were part of a continuous chain of events, such that Batiste was guilty of capital murder with the underlying felony of robbery.[5] Because the jury properly was instructed on the one-continuous-transaction rule, it was able to determine whether the killing and the robbery had occurred as part of a continuous chain of events. Batiste was not entitled to further jury instructions on the matter, and this issue is without merit.

### C. *Oral Instructions*

¶36. Batiste also argues that the trial court erred by instructing the jury orally that it could convict him of capital murder even if it found Batiste never formed the intent to rob Galanis. He contends this occurred during the closing arguments by the defense, during the following exchange:

> BY MR. LAPPAN: You're going to have a jury charge. You're going to have all the instructions. Okay?
> One of them reads, "The Court instructs the jury that the phrase 'while engaged in the commission of,' includes – the attempt to commit the crime, the completed crime, as well as the immediate post-crime acts of the defendant so connected to the homicide to become a part of it."
> "So connected to the homicide to become a part of it."
> Do any of you think that when Bobby Batiste was swinging the bag, fatally injuring Andreas Galanis, that he was thinking, I'm going to take money off of him, and I'm going to buy cleaning solution for the floor, and paint for the wall, and a wheelbarrow, and a Rug Doctor, to cover up my

---

[5] In *Gillett*, this Court explicitly rejected the dissent's contention that, for capital murder with the underlying felony of robbery, the intent to rob must have formed prior to the killing. *Gillett*, 56 So. 3d at 492 n.15. Thus, we rejected Gillett's argument that a defendant tried for capital murder with the underlying felony of robbery is entitled to have the jury instructed that the intent to rob must have formed before the killing occurred. *Id.* at 493. Our ruling today follows our precedent in *Gillett*. While ours is a broader interpretation of "while engaged in the commission of the crime of robbery" than the dissent would adopt, we find no compelling reason to depart from precedent.

19

killing of him? Who thinks that?

If it is your decision that he killed Andreas, and he has no defense, he's guilty of murder, then. He murdered him. And after he murdered him, he used money to cover up the murder.

Where is the intent to rob him? Where is it?

BY MR. ALLGOOD: If your Honor please, I'm going to object. We don't have to prove intent to rob. That's in the instructions. I object to that.

BY MR. LAPPAN: They have to prove robbery, though, Your Honor.

BY THE COURT: Sustained. I instructed the jury.

BY MR. LAPPAN: Your Honor, with respect to – let me find the Court's robbery instruction, ladies and gentlemen.

The Court instructs you that robbery is defined as the unlawful – unlawfully, willfully, feloniously taking, stealing, and carrying away some property from the presence of another person either by violence to the person or by threats or intimidation.

You'd have to find – you'd have to – this is instruction SGP-4. You'd have to find that this was Bobby's intent at the time –

BY MR. ALLGOOD: If Your Honor please, that is not the law. I object.

BY THE COURT: Spicer v. State. I've already ruled on that. Do not go there again. 921 So. 2d. I've ruled on that. That's not the law.

BY MR. LAPPAN: SGP-4 is in your charge, is the Court's charge. Read it and please apply it to the case. This is the law as told to you by Judge Kitchens.

¶37. Batiste notes that the prosecutor stated that he "did not have to prove intent to rob" and argues that the "only message the jury could have received from the trial court's rulings was the one that the prosecutor was arguing to them." We disagree. The trial court sustained the State's objection to Batiste's erroneous argument that Batiste had to have formed an intent to rob Galanis at the time he struck the fatal blows. The trial court correctly held that Batiste's argument was not the law; as explained above, the State did not have to prove that

Batiste had the intent to rob prior to the killing, but that the killing and the robbery were part of a continuous chain of events and part of the *res gestae*. **Gillett**, 56 So. 3d at 492. And the trial court never instructed the jury orally that the State did not have to prove intent. Rather, the trial court stated "I instructed the jury." As previously discussed, instruction SGP-4 properly instructed the jury on the intent requirement for robbery. We presume that the jury followed the instructions given by the trial court; "[t]o presume otherwise would be to render the jury system inoperable." **Pitchford v. State**, 45 So. 3d 216, 240 (Miss. 2010). Because the trial court did not instruct the jury erroneously from the bench, this issue is without merit.

¶38.    Batiste also complains that, during closing arguments, the prosecutor instructed the jury that the State did not have to prove Batiste had intended to rob Galanis. The prosecutor stated

> The law is that if he kills him in the commission of a robbery, then he is guilty of capital murder.  And the phrase 'in the commission of' includes those acts that happen after the homicide that are so closely connected to it as to be part of the same transaction. I don't have to prove that he intended to rob him at all. I can prove that he killed him and robbed him as an afterthought, and it's still capital murder.

Batiste did not object to this argument. We have stated "[i]f no contemporaneous objection is made, the error, if any, is waived. This rule's applicability is not diminished in a capital case." **Walker v. State**, 913 So. 2d 198, 227 (Miss. 2005) (quoting **Foster v. State**, 639 So. 2d 1263, 1270 (Miss. 1994)).

¶39.    Notwithstanding the procedural bar, this issue is without merit. "[A]ny allegedly improper prosecutorial comments must be considered in context, considering the circumstances of the case, when deciding on their propriety." **McGilberry v. State**, 741 So.

21

2d 894, 910 (Miss. 1999) (citing *United States v. Bright*, 630 F.2d 804, 825 (5th Cir. 1980); *United States v. Austin*, 585 F.2d 1271, 1279 (5th Cir. 1978)). While it appears problematic that the prosecutor stated the State did not have to prove intent to rob, the remark was made in the context of describing how the one-continuous-transaction rule applied to the case. Even if the comment was improper, it would not constitute grounds for reversal unless "the natural and probable effect of the prosecuting attorney's improper argument created unjust prejudice against the accused resulting in a decision influenced by prejudice." *McGilberry*, 741 So. 2d at 910 (quoting *Rushing v. State*, 711 So. 2d 450, 455 (Miss. 1998)). Here, the jury received proper instruction on the elements of capital murder and on the one-continuous-transaction rule. Alternatively, and without waiving the procedural bar, we cannot say that the prosecutor's comment unjustly prejudiced Batiste such that the verdict was influenced by prejudice.

II.   WHETHER THE TRIAL COURT ERRED IN REFUSING TO REQUIRE THE STATE TO PROVIDE ADEQUATE NOTICE TO BATISTE – EITHER IN THE INDICTMENT OR WHEN REQUESTED THEREAFTER – REGARDING THE SPECIFIC PROPERTY THAT WAS THE OBJECT OF THE ROBBERY ALLEGED AS THE CAPITALIZING CRIME.

¶40.   Batiste argues that the indictment was fatally defective because it did not specify the items alleged to have been taken in the robbery. Batiste's indictment charged that

BOBBY BATISTE

late of the County aforesaid, on or about the 7th day of March, 2008, in the County and State aforesaid, did unlawfully, willfully, and feloniously, with or without the deliberate design to effect death, kill Andreas Galanis, a human being, without authority of law and not in necessary self defense, while engaged in the commission of a Robbery, in violation of Section 97-3-19(2)(e) MCA 1972 as amended; contrary to the form of the statutes in such cases made and provided, and against the peace and dignity of the State of Mississippi

22

. . . .

Batiste filed a pretrial motion requesting that the trial court require the State to identify the item feloniously taken against Galansis's will. The trial court denied the motion, finding the indictment to be sufficient because "the State is not required to set out the elements of the underlying felony in an indictment for capital murder."

### A. Whether the Indictment Deprived Batiste of Notice.

¶41. Batiste argues that the trial court's failure to require the State to specify the items stolen violated his due-process rights under the Fourteenth Amendment to the United States Constitution and Article 3, Section 14 of the Mississippi Constitution. U.S. Const. amend. XIV; Miss. Const. art 3, § 14. He argues that the deficiency in the indictment also deprived him of his constitutional right to "a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 477, 120 S. Ct. 2348, 2356, 147 L. Ed. 2d 435 (2000); U.S. Const. amend V; U.S. Const. amend. VI; U.S. Const. amend. XIV. He argues that, because robbery is a specific-intent crime, the defense must be notified of the object claimed to have been stolen. Batiste argues that the indictment violated his constitutional rights because, since it did not recite the item or items taken, it failed to charge the essential elements of the offense. The evidence presented several items the State could have selected to charge as the subject of the robbery: Galanis's wallet, his car keys, his Visa card, his checkbook, and cash that may reasonably be inferred to have been inside the wallet and used by Batiste to buy cleaning supplies. Batiste argues that the State's failure to specify an item or items prejudiced his defense because he was forced to guess which of the objects the State would claim were the

23

subject of the robbery and part of the *res gestae* of the crime.

¶42.    "In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation." U.S. Const. amend. VI; *see also* Miss. Const. art. 3, § 26 (1890) ("In all criminal prosecutions the accused shall have the right . . . to demand the nature and cause of the accusation."). "The purpose of an indictment is to furnish the defendant with notice and a reasonable description of the charges against him so that he may prepare his defense." *Goff v. State*, 14 So. 3d 625, 665 (Miss. 2009). An indictment must contain "a clear and concise statement of the elements of the [charged] crime." *Id.* It "must contain (1) the essential elements of the offense charged, (2) sufficient facts to fairly inform the defendant of the charge against which he must defend, and (3) sufficient facts to enable him to plead double jeopardy in the event of a future prosecution for the same offense." *Gilmer v. State*, 955 So. 2d 829, 836-37 (Miss. 2007) (quoting *Hamling v. United States*, 418 U.S. 87, 117, 94 S. Ct. 2887, 2907, 41 L. Ed. 2d 590 (1974)).

¶43.    In general, an indictment tracking the language of the criminal statute is sufficient to inform the defendant of the charged crime. *Stevens v. State*, 808 So. 2d 908, 912 (Miss. 2002). In capital-murder cases, unless the underlying felony is burglary,[6] "the underlying felony that elevates the crime to capital murder must be identified in the indictment along with the section and subsection of the statute under which the defendant is being charged." *Goff*, 14 So. 3d at 665 (citing *Bennett v. State*, 933 So. 2d 930, 952 (Miss. 2006)); Miss.

---

[6] In *State v. Berryhill*, 703 So. 2d 250, 255 (Miss. 1997), this Court held that "capital murder indictments that are predicated on burglary are required to state the underlying offense to the burglary."

24

Code Ann. § 99-17-20 (Rev. 2007). No further detail is required. *Goff*, 14 So. 3d at 665. Because Batiste's indictment complied with these requirements, it met the legal requirements for an indictment for capital murder with the underlying felony of robbery. We note that the elements of robbery are such that a robbery indictment need not list the specific item that is the subject of the robbery. Miss. Code Ann. § 97-3-73 (Rev. 2006). Therefore, a requirement that an indictment for capital murder predicated on robbery list the allegedly stolen items would require even more detail than a robbery indictment. Batiste cites no authority holding that due process requires that a robbery indictment list the allegedly stolen items. This issue is without merit.

> B.  *Whether the Indictment was Sufficient to Provide Batiste with the Protections Afforded by Double Jeopardy.*

¶44.    Batiste argues that the indictment was insufficient to protect him from reprosecution for the same offense. The Fifth Amendment's Double Jeopardy Clause states that "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb. . . ." U.S. Const. amend. V; U.S. Const. amend. XIV; *see also* Miss. Const. art 3, §22 ("[n]o person's life or liberty shall be twice placed in jeopardy for the same offense"). An indictment must contain sufficient facts to enable the defendant to plead double jeopardy if the State attempts a future prosecution for the same crime. *Goforth v. State*, 70 So. 3d 174, 188 (Miss. 2011) (quoting *Berry v. State*, 996 So. 2d 782, 786 (Miss. 2008)); *Blockburger v. U.S.*, 284 U.S. 299, 304, 52 S. Ct. 180, 182, 76 L. Ed. 306 (1932).

¶45.    Batiste argues that the failure to specify the item taken in the robbery in the capital-murder indictment left him open to a future prosecution for larceny of any of the objects.

25

Batiste cites no authority for the proposition that an indictment for capital murder or robbery must specify the item alleged to have been taken in order to avoid double jeopardy. We find that the indictment was sufficient such that any future prosecution for larceny of an item taken as part of the *res gestae* of the capital murder would be barred.

C.      *Whether this Court will Apply its Reasoning from **Berryhill** to the Underlying Felony of Robbery.*

¶46.    This Court has held that, when the predicate felony is burglary, a capital-murder indictment must state the underlying offense to the burglary. ***Berryhill***, 703 So. 2d at 255. This is because:

> "The crime of burglary of a dwelling has two elements: (1) the burglarious breaking and entering a dwelling, and (2) the felonious intent to commit some crime therein."
>
> . . .
>
> [T]he level of notice that would reasonably enable a defendant to defend himself against a capital murder charge that is predicated upon burglary must, to be fair, include notice of the crime comprising the burglary. Burglary is unlike robbery and all the other capital murder predicate felonies in that it requires as an essential element the intent to commit another crime. While it is true that the general rule finds indictments that track the language of the criminal statute to be sufficient, the fairer rule in case of capital murder arising out of burglary . . . would require the indictment to name the crime underlying the burglary in addition to tracking the capital murder statute.
>
> . . .
>
> As the facts in this case demonstrate, a defendant such as Berryhill who has been indicted without specifying the burglary may find out on the eve of trial that the State might try to prove the burglary on different theories. Needless to say, different theories would plainly invite different defenses. Such "trial by ambush" is at odds with this Court's jurisprudence on the need for an indictment to give enough notice for a defendant to prepare a defense.
>
> The second reason that we hold that murder indictments made capital must specify the nature of the underlying burglary is predicated upon the well-settled law that a defendant cannot be put in jeopardy for crimes except

26

those which a grand jury of his peers has presented.

*Id.* at 255-57 (citations omitted).

¶47.    In *Berryhill*, we recognized that, when the underlying felony is robbery, "[i]n the context of capital murder, this Court has further held that a bare allegation of robbery in an indictment, without further specification of the facts in support of that, is sufficient." *Id.* (citing *Mackbee v. State*, 575 So. 2d 16, 35 (Miss. 1990)). Batiste urges this Court to "revisit its conclusion that robbery is in all instances different from burglary." He argues that the intent requirements for burglary and robbery are analogous, because burglary requires the intent to commit a specific felony, while robbery requires the specific intent to steal property. Batiste argues that, due to these similarities, applying the reasoning of *Berryhill*, this Court should require that an indictment for capital murder predicated on robbery specify the item taken. Since his indictment lacked this specificity, Batiste argues, he was deprived of notice, forced to defend against evolving theories, and subjected to double jeopardy and trial by ambush. *See* *Berryhill*, 703 So. 2d at 255-57.

¶48.    This Court has not required indictments for capital murder with the underlying felony of robbery or indictments for robbery to list the objects taken in the robbery. In *Berryhill*, this Court specifically distinguished robbery from burglary, stating "this Court has further held that a bare allegation of robbery in an indictment, without further specification of the facts in support of that, is sufficient . . . . [b]urglary is unlike robbery and all the other capital murder predicate felonies in that it requires as an essential element the intent to commit another crime." *Id.* at 256. While burglary requires as an essential element the intent to commit some specific crime, a defendant is guilty of robbery if the State proves he

27

feloniously took another's personal property by force or by putting that person in fear, no matter what that property was. Miss. Code Ann. § 97-3-73 (Rev. 2006). We find that Batiste has put forth no compelling reason to expand *Berryhill*'s holding to require that a capital-murder indictment predicated on robbery list the object taken.

> D. *Whether the Failure to Furnish Batiste with Notice of the Object of the Robbery Requires that his Death Sentence be Set Aside.*

¶49. Batiste argues that, without notice of the specific item that is the subject of the robbery, the State failed to narrow his conduct to a level of egregiousness that could support the imposition of the death penalty. Under the Eighth Amendment, states must ensure that the death penalty is appropriate and not randomly imposed. *Romano v. Oklahoma*, 512 U.S. 1, 7, 114 S. Ct. 2004, 2009, 129 L. Ed. 2d 1 (1994). "To pass constitutional muster, a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" *Id.* (quoting *Lowenfield v. Phelps*, 484 U.S. 231, 108 S. Ct. 546, 98 L. Ed. 2d 568 (1988)). To accomplish this narrowing, the "State must establish rational criteria that narrow the decisionmaker's judgment as to whether the circumstances of a particular defendant's case meet the threshold." *Romano*, 512 U.S. at 7, 114 S. Ct. at 2009.

¶50. Our capital-murder statute narrows the class of murders to those with additional egregious characteristics. Miss. Code Ann. § 97-3-19(2)(a)-(h) (Rev. 2006). Batiste's indictment placed him on notice that the capitalizing crime was robbery. Section 97-3-19(2)(e) states that "the killing of a human being without the authority of law by any manner

28

or in any means shall be capital murder . . . when done with or without any design to effect death, by any person engaged in the commission of the crime of . . . robbery . . . ." Miss. Code Ann. § 97-3-19(2)(e) (Rev. 2006). Because Batiste's indictment charged him with capital murder predicated on robbery, the State sufficiently narrowed Batiste's conduct to a level of egregiousness sufficient to support imposition of the death penalty. *See **Romano***, 512 U.S. at 7, 114 S. Ct. at 2009. The particular item stolen in the robbery is immaterial. This issue is without merit.

> *E.     Whether the Prosecutor's Comment about Batiste's Withdrawals from Galanis's Checking Account Constituted Reversible Error.*

¶51.    Batiste raised this issue briefly in his challenge to the indictment. During initial closing arguments, the prosecutor argued that the killing had occurred in the course of a robbery because Batiste had admitted to having taken Galanis's wallet from his body. Then, the prosecutor stated:

> That's robbery, ladies and gentlemen. But there's more. Because you see, ladies and gentlemen, there's that relationship that he had with Andreas Galanis. It was that of a parasite. He'd literally been living off the man for months, bleeding him dry of his checking account. He saw Andreas Galanis more as a source of revenue than as a human being, and he used him for that.

There was no objection from Batiste, and the prosecutor proceeded to argue that the jury reasonably could infer that Batiste had taken Galanis's money from his wallet. During final closing arguments, the prosecutor stated "He used him. He used his checking account[,] he used his Visa card, and yes, ladies and gentlemen, I think he used the money in his wallet."

¶52.    Batiste argues that the prosecutor erroneously argued that the jury could consider Batiste's prior theft of money from Galanis's checking account as establishing the robbery.

29

But this theft could not have constituted robbery, because the element of force or putting in fear was missing. *See* Miss. Code Ann. § 97-3-73 (Rev. 2006). Batiste argues that, because no jury instruction was given that specified the items taken, the jury improperly may have believed that the robbery had occurred when Batiste took money from Galanis's checking account. This issue is procedurally barred, because Batiste did not object to the prosecutor's comments. ***Foster v. State***, 639 So. 2d 1263, 1288-89 (Miss. 1994). Nor did Batiste preserve the issue for appeal by requesting a jury instruction prohibiting the jury from considering the money stolen from the checking account as proof of robbery. ***Havard v. State***, 94 So. 3d 229, 235 (Miss. 2012).

¶53. Notwithstanding the procedural bar, we find no error. Attorneys are afforded wide latitude in closing arguments. ***McGilberry v. State***, 741 So. 2d 894, 910 (Miss. 1999). "Given the latitude afforded an attorney during closing argument, any allegedly improper prosecutorial comments must be considered in context, considering the circumstances of the case, when deciding on their propriety." ***Id.*** (citing ***United States v. Bright***, 630 F.2d 804, 825 (5th Cir. 1980)); ***United States v. Austin***, 585 F.2d 1271, 1279 (5th Cir. 1978). Here, the prosecutor's comments, taken in context, show that the prosecutor was not arguing that Batiste had committed robbery by using Galanis's debit card without permission. Rather, the prosecutor was urging the jury to draw the inference from Batiste's prior clandestine use of the debit card that he later had removed the money from Galanis's wallet, which constituted robbery. Considered in context, we cannot say the prosecutor's comments were improper. Notwithstanding the procedural bar, this issue is without merit.

III.    WHETHER THE FOREGOING ERRORS WERE EXACERBATED AND MADE

MORE PREJUDICIAL BY THE TRIAL COURT'S CONSTITUTIONALLY ERRONEOUS DENIAL OF BATISTE'S UNANIMITY INSTRUCTION PERTAINING TO ROBBERY.

¶54. Batiste requested a unanimity instruction, which stated:

> For you to find Bobby Batiste guilty of capital murder, you must also agree, unanimously and beyond a reasonable doubt, that Mr. Batiste robbed Andreas Galanis of the same item. If all twelve of you do not agree on the same criminal act which supports the State's allegation of robbery, you must find Bobby Batiste not guilty of capital murder.

The trial court refused the instruction. Batiste argues that the denial of the instruction violated his federal and state constitutional rights to a unanimous verdict.

¶55. This Court will affirm the trial court's grant or denial of a requested jury instruction if the jury instructions, read as a whole, fairly announce the case and create no injustice. *Fulgham*, 46 So. 3d at 323. In *Fulgham*, this Court found that the trial court properly had refused a jury instruction identical to the one requested by Batiste. *Id.* at 323, 326. At Fulgham's trial, the State had presented evidence that Fulgham had robbed the victim of his wallet or a computer CPU. *Id.* at 323. Fulgham also argued that the verdict was fatally flawed because it was not necessarily unanimous, as some jurors could have found that Fulgham robbed the victim of the wallet, while other jurors could have found she had taken the CPU. *Id.* We addressed whether Fulgham had been entitled to a unanimity instruction under those facts. *Id.* at 324.

¶56. First, we determined that the United States Constitution does not bestow a federal constitutional right to a unanimous verdict by a twelve-member jury in state court. *Id.* (citing *Apodaca v. Oregon*, 406 U.S. 404, 410-12, 92 S. Ct. 1628, 32 L. Ed. 2d 184 (1972); *Johnson v. Louisiana*, 406 U.S. 356, 359-63, 92 S. Ct. 1620, 32 L. Ed. 2d 152 (1972); *but see Burch*

31

*v. Louisiana*, 441 U.S. 130, 99 S. Ct. 1623, 60 L. Ed. 2d 96 (1979) (requiring unanimity for conviction of a nonpetty offense by a six-person jury)).

¶57.    Second, we determined that, while there is a state constitutional right to a unanimous twelve-member jury, that right was not violated by the denial of the instruction. *Fulgham*, 46 So. 3d at 324. The United State Supreme Court has stated that:

> We have never suggested that in returning general verdicts in such cases, the jurors should be required to agree upon a single means of commission, any more than the indictments were required to specify one alone. In these cases, as in litigation generally, "different jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line. Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict."

*Schad v. Arizona*, 501 U.S. 624, 631-32, 111 S. Ct. 2491, 2467, 115 L. Ed. 2d 555 (1991) (citation omitted). "[A] federal jury need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element, say, which of several possible means the defendant used to commit an element of the crime." *Richardson v. U.S.*, 526 U.S. 813, 817, 119 S. Ct. 1707, 1710, 143 L. Ed. 2d 985 (1999). Additionally, reversal is not warranted when the jury is presented with alternative factual theories, but one of those theories is factually inadequate to sustain the conviction. *Griffin v. United States*, 502 U.S. 46, 59, 112 S. Ct. 466, 474, 116 L. Ed. 2d 371 (1991). This is because "jurors are well equipped to analyze the evidence." *Id.*

¶58.    In *Fulgham*, we found that the jury properly had been instructed that an element of robbery is the taking, stealing, and carrying away the personal property of another. *Fulgham*, 46 So. 3d at 326. We reasoned that, while that element could be fulfilled by alternative fact patterns, the facts still lead to the conclusion that the defendant was guilty of

32

a single offense, that of robbery. *Id.* The Court was "satisfied that this jury was perfectly capable of sifting through the evidence presented and was able to discard any factually insufficient theories." *Id.* We further noted that requiring a unanimous verdict on the item taken could have fostered an absurd result. *Id.* "For example, while all twelve jurors might agree that Fulgham had killed Joey and had stolen some of his personal property, acquittal would be required if six believed she had stolen his money and the other six believed she had stolen the CPU." *Id.* We concluded that Fulgham was not entitled to the unanimity instruction. *Id.*

¶59.    Batiste's case is not distinguishable from Fulgham's. As in *Fulgham*, Batiste's jury properly was instructed that one of the elements of robbery is taking, stealing, and carrying away the personal property of another. As in *Fulgham*, the evidence supported alternative theories regarding exactly what property was stolen. There was sufficient evidence from which a juror could have found, beyond a reasonable doubt, that Batiste had robbed Galanis of his wallet, his car keys, his Visa card, his checkbook, or cash that reasonably may be inferred to have been inside the wallet and used by Batiste to buy supplies to clean up the crime scene. Under *Fulgham*, jury unanimity is not required regarding which item or items were the subject of the underlying felony of robbery. *Id.* Batiste was not entitled to his proffered unanimity instruction.

¶60.    Batiste seeks to distinguish Fulgham. He argues that, in *Fulgham*, the Court rested its holding upon the fact that the State did not argue erroneously to the jury that life insurance proceeds that were the subject of an earlier theft could support the robbery conviction. *Id.* at 323. Here, Batiste argues, the prosecutor *did* argue in closing that the money he withdrew

33

from Galanis's account could have supported a jury finding that the killing had occurred in the course of a robbery. As previously discussed in Issue II.E, Batiste's challenge to the prosecutor's comments is procedurally barred; notwithstanding the procedural bar, no error resulted, because the comments, taken in context, did not urge the jury to find Batiste guilty of robbery for his prior theft of money from Galanis's checking account. Rather, the prosecutor argued that Batiste's prior theft from Galanis's checking account made it more likely that he had removed cash from Galanis's wallet, constituting robbery. Thus, this case is not distinguishable from *Fulgham*, and this issue is without merit.

IV.     WHETHER AS A CONSEQUENCE OF THE TRIAL COURT'S ERRONEOUS RULINGS, PROOF OF ROBBERY AT TRIAL WAS INSUFFICIENT TO ESTABLISH THE ROBBERY ELEMENT OF CAPITAL MURDER IN A STATUTORILY OR CONSTITUTIONALLY REQUISITE FASHION.

¶61.    Batiste challenges the sufficiency of the evidence supporting his capital-murder conviction. He argues that, because the evidence was insufficient to support the verdict, the trial court erred by denying his motion for a directed verdict, his request for a peremptory instruction, and his motion for judgment notwithstanding the verdict (JNOV). Batiste's sufficiency argument is intertwined with his prior arguments that the jury instructions, in combination with the trial court's oral statements to the jury and the prosecutor's closing argument, left the jury free to convict him of capital murder without a finding of intent to rob. Because we already have found those arguments to be without merit, we proceed to review the sufficiency of the evidence of capital murder with the underlying felony of robbery.

¶62.    In reviewing the sufficiency of the evidence "the critical inquiry is whether the evidence shows 'beyond a reasonable doubt that accused committed the act charged, and that

34

he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.'" *Bush v. State*, 895 So. 2d 836, 843 (Miss. 2005). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 315, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). The evidence will be found sufficient if "it is of such quality and weight that, 'having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense.'" *Bush*, 895 So. 2d at 843 (quoting *Edwards v. State*, 469 So. 2d 68, 70 (Miss. 1985)). But, if the facts and inferences, so considered, "point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty," then we will reverse and render. *Bush*, 895 So. 2d at 843.

¶63.    Under the capital-murder statute, "the killing of a human being without the authority of law by any manner or in any means shall be capital murder . . . when done with or without any design to effect death, by any person engaged in the commission of the crime of . . . robbery . . . ." Miss. Code Ann. § 99-3-19(2)(e) (Rev. 2007). The robbery statute provides:

> Every person who shall feloniously take the personal property of another, in his presence or from his person and against his will, by violence to his person or by putting such person in fear of some immediate injury to his person, shall be guilty of robbery.

Miss. Code Ann. § 97-3-73 (Rev. 2006). The essential elements of robbery are: "that the defendant: (1) feloniously took (2) the personal property of another (3) in his presence or

35

from his person and (4) against his will, (5) by violence to his person or by putting such person in fear of some immediate injury to his person. *Fulgham*, 46 So. 3d at 323-24.

¶64.    The element of felonious intent may be shown by the facts surrounding the crime. *Gillett*, 56 So. 3d at 492 (quoting *Walker v. State*, 913 So. 2d 198, 224 (Miss. 2005)).  For example, when a defendant is discovered in possession of the dead victim's personal property, the jury reasonably may infer that the defendant had the requisite intent to rob. *Gillett*, 56 So. 3d at 492. Further, "[i]f the intervening time between the time of the murder and the time of taking of the property formed a continuous chain of events, the fact that [the victim] was dead when [the defendant] took the property [cannot] absolve the defendant from the crime of robbery." *West v. State*, 463 So. 2d 1048, 1055-56 (Miss. 1985) (quoting *Cobern v. State*, 273 Ala. 547, 142 So. 2d 869, 871 (1962)).

¶65.    We find that the evidence was sufficient to sustain Batiste's capital-murder conviction. The State presented evidence that Batiste killed Galanis and took his personal property. Batiste admitted that he had killed Galanis, left the apartment briefly, and returned to clean up the crime scene.  He admitted that he had removed Galanis's wallet from his dead body. Galanis's car keys and checkbook were found in Batiste's room. Batiste used Galanis's Visa card to rent a Rug Doctor and buy cleaning fluid. The facts that Batiste admitted to having taken Galanis's wallet, that the empty wallet was found in a bag in Batiste's truck, that Galanis had withdrawn $200 in cash the previous day, that Batiste had stated that he had to borrow $10 from Galanis for gas the previous day, and that Batiste had paid cash for the paint, wheelbarrow, and cleaning supplies created a reasonable inference that Batiste had removed cash from Galanis's wallet.

¶66. Because Batiste was in the midst of disposing of Galanis's body and cleaning up the crime scene when the crime was discovered, a rational jury could have found beyond a reasonable doubt that Batiste had killed Galanis and robbed him of any or all of the items as part of a continuous chain of events. *See Gillett*, 56 So. 3d at 492 (quoting *Pickle v. State*, 345 So. 2d 623, 627 (Miss. 1977)). Because Batiste was found in possession of Galanis's property after his death, it was within reason for the jury to find the killing had occurred in the commission of a robbery. *Gillett*, 56 So. 3d at 492 (quoting *Walker v. State*, 913 So. 2d 198, 224 (Miss. 2005)); *see also Knox v. State*, 805 So. 2d 527, 531 (Miss. 2002). Additionally, the jury reasonably could have inferred from Batiste's prior theft of money from Galanis's checking account that Batiste had formed the intent to rob Galanis. While the jury could have rejected the State's theory that Batiste had the intent to rob, the fact that a number of competing inferences may be drawn from the facts surrounding a defendant's intent is of no matter. *Goff*, 14 So. 3d at 650. Considering the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the verdict, we find that a rational trier of fact could have found the essential elements of capital murder beyond a reasonable doubt.

¶67. Batiste further argues that this Court's decision that the "one continuous transaction" evidentiary doctrine is sufficient to establish all the elements of capital murder in this case violates Batiste's due process rights to a fair trial under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and his Sixth and Fourteenth Amendment rights to have the jury properly instructed and to a jury determination of guilt of every element of the crime charged based upon sufficient, admissible evidence. Batiste claims that

37

his trial was unfair because he was deprived of a jury determination that he was guilty of every element of the crime charged beyond a reasonable doubt. He contends that the State was not required to prove intent to rob. However, as previously discussed, the jury was instructed properly on the elements of robbery, including the element of felonious intent. Instruction SGP-5 correctly set out the "one continuous transaction" rule. We find that, because the jury was instructed on all the elements of capital murder, Batiste was not deprived of his constitutional rights to a fair trial and to a jury determination of every element of the crime charged.

## V.    WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ITS OTHER INSTRUCTIONS TO THE JURY AT THE CULPABILITY PHASE.

### A.    The Manslaughter Instruction

¶68.    The jury was instructed on the theories of capital murder, deliberate-design murder, and Batiste's self-defense theory. Batiste argues that he was entitled to jury instructions on his theories of heat-of-passion manslaughter and imperfect self-defense manslaughter. Batiste proffered a manslaughter instruction stating:

> If you find from the evidence in this case beyond a reasonable doubt that:
>
> 1. On or about March 7, 2008, in Oktibbeha County;
> 2. That Andreas Galanis was a human being; and
> 3. That Bobby Batiste did kill Andreas Galanis without malice, in the heat of passion, in a cruel and unusual manner, or by the use of a dangerous weapon, without authority of law and not in necessary self-defense;
> then you shall find the defendant guilty of manslaughter.
>
> If the prosecution has failed to prove any one or more of the above listed elements beyond a reasonable doubt, then you shall find Mr. Batiste not guilty of manslaughter.

*See* Miss. Code Ann. § 97-3-35 (Rev. 2006). The trial court refused the instruction, finding it lacked evidentiary support.

¶69.   "A defendant is entitled to have jury instructions given which present his theory of the case. This entitlement is limited, however, in that the Court is allowed to refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." *Spicer*, 921 So. 2d at 313 (citing *Parks v. State*, 884 So. 2d 738, 746 (Miss. 2004)). Manslaughter is a lesser-included offense of capital murder. Miss. Code Ann. § 97-3-19(3) (Rev. 2006). We have held that a lesser-included-offense instruction

> should be granted unless the trial judge and ultimately this Court can say, taking the evidence in the light most favorable to the accused and considering all the reasonable inferences which may be drawn in favor of the accused from the evidence, that no reasonable jury could find the defendant guilty of the lesser-included offense (conversely, not guilty of at least one element of the principal charge).

*Anderson v. State*, 79 So. 3d 501, 505 (Miss. 2012) (quoting *Mease v. State*, 539 So. 2d 1324, 1330 (Miss. 1989)). There must be an evidentiary basis in the record to support a lesser-included-offense instruction. *Anderson*, 79 So. 3d at 505.

¶70.   Mississippi Code Section 97-3-35 codifies the crime of manslaughter and provides that "[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense, shall be manslaughter." Miss. Code Ann. § 97-3-35 (Rev. 2006). "Heat of passion" has been defined as:

> [a] state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from the grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the

39

time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.

*McCune v. State*, 989 So. 2d 310, 319 (Miss. 2008) (quoting *Agnew v. State*, 783 So. 2d 699, 703 (Miss. 2001)). Passion and anger alone are insufficient to support manslaughter. *Agnew*, 783 So. 2d at 703. "[T]here must be such circumstances as would indicate that a normal mind would be roused to the extent that reason is overthrown and passion usurps the mind destroying judgment." *McCune*, 989 So. 2d at 319 (quoting *Agnew*, 783 So. 2d at 703-704).

¶71. Batiste argues that his confessions created an evidentiary basis for a manslaughter instruction. He contends that Galanis's angry confrontation with him, in which Galanis aggressively jabbed at him with a sword and called him a "black bitch," were sufficient provocation to justify a heat-of-passion manslaughter instruction. According to Batiste's first statement, the initial confrontation ceased when Galanis retreated into his own room with the sword. Batiste went to his truck, got the rim adaptor, and confronted Galanis, stating "what was that [you were] saying," and then struck Galanis four times after Galanis had again jabbed at him with the sword. In Batiste's second statement, Batiste stated that he got the rim adaptor and retreated to his own room after the initial confrontation. Galanis was still talking, and Batiste said "what's that you've been saying again," and Galanis cursed at him and jabbed at him with the sword, prompting Batiste to strike Galanis four times with the rim adaptor.

¶72. We find that the evidence was insufficient to support Batiste's heat-of-passion manslaughter theory. Manslaughter must be committed in the heat of passion. *Id.* at 319. But Batiste said nothing in his confessions to indicate he was in a state of "violent and

40

uncontrollable rage." Rather, Batiste, in a calculating manner, left the apartment and obtained a weapon. "Denial of a manslaughter instruction is proper where the record is clear that the decedent was [killed] with malice or deliberate design." *Simmons v. State*, 805 So. 2d 452, 474 (Miss. 2001). Batiste's claim that he struck Galanis just four times with the rim adaptor was strongly undermined by the evidence that Galanis had suffered thirty-six separate injuries, and that his blood was found on both the rim adaptor and also on a tire iron found in Batiste's truck. This was overwhelming evidence that Batiste had killed Galanis with deliberate design.

¶73.   Further, Galanis's conduct, as described by Batise, was not reasonable provocation. Batiste stated that, early in the argument, Galanis had threatened to get a gun and shoot him in the head.  Later, Galanis yelled at him, called him a name, and jabbed at him with a sword. Batiste never said Galanis injured him with the sword, and no injuries were observed on Batiste's body.  Galanis's conduct would not have roused a normal mind "to the extent that reason is overthrown and passion usurps the mind destroying judgment." *Id.* Instead, the confrontation between Galanis and Batiste was similar to that in *Phillips v. State*, 794 So. 2d 1034, 1038 (Miss. 2001), in which "the record [did] not reflect that [the victim]  was using deadly force against [the defendant], but instead that [the victim] pushed [the defendant]'s hand a few times and [the defendant] pushed [the victim] back."

¶74.   Batiste also argues that there was an evidentiary basis for his imperfect-self-defense manslaughter theory.  "Imperfect self-defense is a theory that can reduce intentional killings from murder to manslaughter where the killing is committed 'without malice but under a bona fide (but unfounded) belief that it was necessary to prevent great bodily harm.'" *Young*

41

*v. State*, 99 So. 3d 159, 165 (Miss. 2012) (quoting *Moore v. State*, 859 So. 2d 379, 383 (Miss. 2003)). "The apprehension or fear that will justify killing another in self-defense must appear objectively real to a reasonable person of average prudence." *Hart v. State*, 637 So. 2d 1329, 1339 (Miss.1994).

¶75.   In *Wade v. State*, 748 So. 2d 771, 775 (Miss. 1999), an imperfect-self-defense instruction was properly denied where there was no evidence that the defendant killed the victim from a fear of death or great bodily harm. Likewise, there was little evidence in this case showing that Batiste feared death or great bodily harm from Galanis. Batiste and Galanis were roughly the same height and weight. While Batiste stated that he armed himself against Galanis, this was insufficient to justify the manslaughter instruction in light of the overwhelming evidence of premeditation. *Simmons*, 805 So. 2d at 474. We note that an imperfect-self-defense instruction is not necessarily warranted every time a self-defense instruction is granted. *Young*, 99 So. 3d at 166. There was no evidentiary basis for an imperfect-self-defense theory, and Batiste was not entitled to a manslaughter instruction.

   B.      *"Fighting words" Instruction*

¶76.   Batiste requested a "fighting words" instruction, that stated:

   Insulting, offensive or abusive words directed to the defendant, accompanied
   by conduct indicating a present intention and ability to cause the defendant
   bodily harm may be adequate provocation to incite violent and irresistible
   passion in a reasonable person.

The trial court denied the instruction. Batiste argues that the evidence that Galanis came into his room, used physical force against Batiste, and called him a "black bitch" entitled him to the above instruction. Batiste strenuously argues that "black bitch" is a racial epithet

42

sufficient to provoke heat of passion. We find that, because Batiste was not entitled to a manslaughter instruction, the "fighting words" instruction was not warranted. But even if Batiste had been granted a manslaughter instruction, he would not have been entitled to this instruction, because "[m]ere words, no matter how provocative, are insufficient to reduce an intentional and unjustifiable homicide from murder to manslaughter." *Anderson*, 79 So. 3d at 506 (quoting *Phillips*, 794 So. 2d at 1037).

### C. Depraved-Heart Murder

¶77. The trial court granted an instruction on deliberate-design murder but refused Batiste's proffered instruction on depraved-heart murder. Batiste argues that a depraved-heart murder instruction should have been granted based on "the same evidentiary facts" as argued in support of the manslaughter instruction.

¶78. Under Mississippi Code Section 97-3-19(1)(b), depraved-heart murder is

> the killing of a human being without the authority of law and by any means or in any manner . . . when done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, *although without any premeditated design to effect the death of any particular individual.*

Miss. Code Ann. § 97-3-19 (1)(b) (Rev. 2006) (emphasis added). As discussed above in Issue V.A., overwhelming evidence existed that Batiste had acted with premeditation when he killed Galanis. Therefore, no evidentiary foundation for a depraved-heart murder instruction existed.

### D. Whether the trial court erroneously restricted Batiste from arguing that the jury could convict him of the lesser offense of murder without first acquitting him of capital murder.

¶79. Batiste requested and the trial court granted instruction D-38, which stated:

43

I instruct you that, if warranted by the evidence, you may find the defendant guilty of a crime lesser than the capital murder of Andreas Galanis. However, it is your duty to accept the law as given to you by the Court, and if the facts and law warrant a conviction of the crime of capital murder, then it is your duty to make such a finding uninfluenced by your power to find a lesser offense. This provision is included to prevent a failure of justice if the evidence fails to prove the original charge of capital murder but does justify a verdict for the lesser crime of murder.

At the jury-instruction conference, Batiste's counsel contended that, based on instruction D-38, he should be able to argue that the jury could consider murder before acquitting Batiste of capital murder. The trial court found that would be "contrary to the court's instructions, which is that they may convict of capital murder, they may acquit of capital murder, . . . then they may proceed on to a determination of murder." The trial court found that the jury must acquit of capital murder before considering murder, not consider murder first. At the conclusion of the discussion, Batiste's counsel stated "I mean you're – you're just saying that the law is going to be acquittal first." The Court responded, "correct." Batiste's counsel stated "I'm not going to argue that. I've always read D-38 to contravene that, but I will not argue that."

¶80. On appeal, Batiste contends that the result of the trial court's ruling was that the jury would have to *unanimously* acquit him of capital murder before it could consider the lesser offense of murder. Our reading of the jury instructions belies this contention. While the jury was given a unanimity instruction requiring a unanimous verdict, none of the instructions required the jury to *unanimously* acquit Batiste of capital murder before considering murder. Rather, under Batiste's requested instruction D-38, the jury merely had to acquit Batiste of capital murder before proceeding to deliberate on his guilt of murder. The burden of proof

44

was not shifted to Batiste. Considering the jury instructions as a whole, the jury was properly instructed, and the jury instructions created no injustice. *See Fulgham*, 46 So. 3d at 323.

VI.    WHETHER THE JURY-SELECTION PROCESS WAS CONSTITUTIONALLY INFIRM AND REVERSAL OF BATISTE'S CONVICTION AND DEATH SENTENCE IS THEREFORE REQUIRED.

A.    ***Batson*** *Challenges*

¶81.    Batiste, an African-American man, was tried by an all-white jury. He argues that the State exercised peremptory challenges on two African-American jurors in violation of ***Batson v. Kentucky***, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). In ***Batson***, the United States Supreme Court held that racial discrimination through the use of peremptory challenges is prohibited by the Equal Protection Clause of the United States Constitution. ***Batson***, 476 U.S. at 79, 106 S. Ct. at 1719. Under ***Batson*** and its progeny, the trial court must adhere to a three-step process for determining whether the State's use of a peremptory challenge was discriminatory. ***Pitchford v. State***, 45 So. 3d 216, 224 (Miss. 2010).

> First, the party objecting to the peremptory strike of a potential juror must make a prima facie showing that race was the criterion for the strike. Second, upon such a showing, the burden shifts to the [other party] to articulate a race-neutral reason for excluding that particular juror. Finally, after a race-neutral explanation has been offered . . . the trial court must determine whether the objecting party has met its burden to prove that there has been purposeful discrimination in the exercise of the peremptory strike, i.e., that the reason given was a pretext for discrimination.

***Id.*** (citing ***Flowers v. State***, 947 So. 2d 910, 917 (Miss. 2007)).

¶82.    When the defendant makes a prima facie case of discrimination, the prosecutor must offer a race-neutral reason for the strike. ***Chamberlin v. State***, 989 So. 2d 320, 337 (Miss. 2008). A prosecutor's reasons for a strike "need not be persuasive, or even plausible; so long

45

as the reasons are not inherently discriminatory, they will be deemed race-neutral." *Chamberlin*, 989 So. 2d at 337 (citing *Rice v. Collins*, 546 U.S. 333, 338, 126 S. Ct. 969, 163 L. Ed. 2d 824 (2006)). Once the trial court determines the prosecutor has proffered a race-neutral reason for the strike, the trial court must determine whether the prosecutor was motivated by discriminatory intent. *Id.* (citing *Purkett v. Elem*, 514 U.S. 765, 767-68, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995)). Disparate treatment between the challenged juror and jurors of the opposite race who share the same characteristics given as the basis for a challenge is an indication of discrimination. *Flowers*, 947 So. 2d at 917.

¶83.    In deciding whether the defendant has made a sufficient showing of discrimination, the trial court must consider all relevant circumstances. *Chamberlin*, 989 So. 2d at 337 (citing *Batson*, 476 U.S. at 96, 106 S. Ct. 1712). "This Court gives great deference to a trial court's determination under *Batson* because it is based largely on credibility." *Chamberlin*, 989 So. 2d at 336-37 (citing *Batson*, 476 U.S. at 98, n. 21, 106 S. Ct. 1712; *Flowers v. State*, 947 So. 2d 910, 917 (Miss. 2007)).  We will not overturn the trial court's ruling unless it was clearly erroneous or against the overwhelming weight of the evidence. *Hughes v. State*, 90 So. 3d 613, 626-27 (Miss. 2012) (citing *Pitchford*, 45 So. 3d at 226).

### 1.  Kenya Clark

¶84.    The State exercised a peremptory challenge on Kenya Clark, an African-American single mother of two. Because the prosecution had struck all three of the African Americans on the panel, Batiste made a *Batson* objection. The State proffered the following race-neutral reasons for the strike of Clark: (1) she would have to have her mother care for her three children to serve on the jury; (2) if something happened to Clark's mother, Clark would have

46

her aunt take care of them; (3) Clark said she was "fifty percent for and fifty percent against" the death penalty and would not impose the death penalty on a first-time offender; (4) Clark watched a lot of Lifetime TV, which was a "red flag" for the prosecutor. The trial court ruled that the prosecutor's reasons for the strike were race-neutral.

¶85.    Batiste argued that the State's reasons were a pretext for racial discrimination because Clark stated that her mother definitely would be able to take care of her children. Further, he argues that two white jurors also had expressed concern about the interference of their domestic obligations with jury service. Linda Jo Templeton was a caregiver for her elderly mother and handicapped sister, but the prosecutor did not question her about that issue.  And Adam Baird was supposed to move out of his apartment during the trial, but the prosecutor did not question him about that issue. Batiste argues that this disparate treatment of Clark and the two white jurors evinces discriminatory intent. Batiste also argues that another white juror, Deborah Bruckner, expressed ambiguity about the death penalty and was not questioned on that subject or challenged by the State. Finally, Batiste argues that the race-neutral reason that Clark watched Lifetime television was not credible.

¶86.    This Court has found that the fact that a juror is single with children is a race-neutral reason for a strike.  *Lockett v. State*, 517 So. 2d 1346, 1356 n.14 (Miss. 1987) (citing *Townsend v. State*, 730 N.W. 2d 24, 26 (Tex. Ct. App. 1987)). We find no indication of disparate treatment, as the domestic problems expressed by Templeton and Baird did not involve child care, as did Clark's. This Court also has found that a juror's views on the death penalty are a race-neutral reason for a strike.  *Pitchford*, 45 So. 3d at 228-29. We find that the trial court's ruling that there was no *Batson* violation was not clearly erroneous or against

the overwhelming weight of the evidence.

<u>2. Lionel Bibbs</u>

¶87.    Batiste challenged the strike of Lionel Bibbs. The prosecutor said he struck Bibbs because one of his uncles had killed the other, because Bibbs lived near a former Sheriff's Department employee who had made disparaging, hostile public remarks about the Sheriff's Department, and because the prosecutor suspected Bibbs was related to a man he had prosecuted for murder. The trial court found the reasons were race-neutral. Batiste argues these reasons were pretextual. However, he did not argue pretext at trial. Therefore, this issue is procedurally barred. ***Pitchford***, 45 So. 3d at 227 (stating that "[w]e will not now fault the trial judge with failing to discern whether the State's race-neutral reasons were overcome by rebuttal evidence and argument never presented").

¶88.    Notwithstanding the procedural bar, the trial court did not clearly err by finding that the prosecutor's reasons for the strike were race-neutral. One of Bibbs's relatives had been murdered by another, the prosecutor thought Bibbs was related to someone he had prosecuted for murder, and Bibbs lived close to someone who was publicly hostile to law enforcement. Without waiving the procedural bar, we cannot say that the trial court's determination that the reasons were race-neutral were clearly erroneous or against the overwhelming weight of the evidence.

B.    *Death-qualification Process: Equal Protection Clause*

¶89.    Batiste argues that the death-qualification process itself disproportionately impacted black venire persons and created a prima facie case that the Equal Protection Clause was violated. The original qualified venire of ninety-five was thirty-percent nonwhite, with

48

twenty-eight African-American members. After voir dire and excusals for cause, the venire from which the jury was struck consisted of thirty-one persons. Of these, three were African-American, roughly ten percent. Batiste argues that the twenty-one-percent decrease in nonwhite venire persons was due to the discriminatory impact of the death-qualification process, which resulted in the disproportionate exclusion of racial minorities because more minorities oppose the death penalty.

¶90.    The Court rejected Batiste's exact argument in *Pitchford v. State*. Pitchford had argued that, because a higher percentage of blacks than whites opposed the death penalty, the death-qualification process had resulted in the disproportionate exclusion of blacks from the venire. *Pitchford*, 45 So. 3d at 228. We held that "a defendant has no right to a petit jury composed in whole or in part of persons of his own race." *Id.* (quoting *Underwood v. State*, 708 So. 2d 18, 28-29 (Miss.1998)). "[I]n the context of the right to a trial by a jury of one's peers—one's peers are not determined by one's race, so this argument has no merit." *Id.* We find this issue to be without merit.

C.    *Death-qualification Process: Particular Jurors*

1. Disqualification Under *Witherspoon* and *Wainwright*

¶91.    Batiste argues that two jurors were excluded for cause who had conscientious scruples against the death penalty, but who still were eligible to serve under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968), and its progeny. "In *Witherspoon*, the United States Supreme Court held that 'a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or

49

religious scruples against its infliction.'" ***Wilcher v. State***, 863 So. 2d 776, 813-14 (Miss. 2003) (quoting ***Witherspoon***, 391 U.S. at 522, 88 S. Ct. at 1777)). However, a venire person can be excluded for cause due to his or her views on capital punishment if "the juror's views would 'prevent or substantially impair the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath.'" ***Wilcher***, 863 So. 2d at 814 (quoting ***Wainwright v. Witt***, 469 U.S. 412, 424, 105 S. Ct. 844, 83 L. Ed. 2d 481 (1985)). This Court gives deference to the trial court's decision to exclude a juror for cause, and we will not disturb the trial court's decision unless there was an abuse of discretion. ***Moffett v. State***, 49 So. 3d 1073, 1094 (Miss. 2010).

¶92.    In this case, jury questionnaires were mailed to each prospective juror. The questionnaires included questions about the death penalty. Each juror was asked whether he or she strongly agreed, mildly agreed, had no opinion, mildly disagreed, or strongly disagreed with the death penalty. Each juror was asked if, in spite of his or her level of agreement or disagreement, he or she could ever personally vote to impose the death penalty, and whether he or she had been to any gatherings in the last year where the death penalty had been discussed. At trial, the trial court held general voir dire. Then, each juror was questioned individually by the court and counsel for both sides on whether the juror's views on the death penalty would prevent or substantially impair his or her performance of the duties of a juror. After the voir dire of each individual juror, the trial court heard arguments on whether that juror should or should not be excluded for cause, and then rendered a decision.

¶93.    Batiste argues that the trial court's exclusion for cause of prospective jurors Kristen Armstrong and Mark Lehman was erroneous, because these jurors did not meet the

50

requirements for removal announced in *Witherspoon* and *Wainwright*. Armstrong had indicated on her juror questionairre that she strongly disagreed with the death penalty. In Armstong's individual voir dire, the prosecutor explained that the jury would be asked to weigh the aggravators and mitigators, and if the mitigation did not outweigh the aggravation, the jury would have to decide what sentence to render. Because Armstrong indicated that, even after weighing the aggravators and mitigators, she would "start off favoring life," the trial court excluded her for cause.

¶94.   Lehman's questionnaire indicated that he mildly disagreed with the death penalty.  In individual voir dire, he stated that he was opposed to the death penalty from a Christian standpoint, and would prefer that the penalty was not imposed.  He stated that, if the jury had weighed the aggravators and mitigators and it was at the point where the jury had to determine life or death, he would favor life.  The trial court removed him for cause.  Both of these jurors indicated that they automatically would favor life over death.  We find that the trial court was within its discretion in excluding Armstrong and Lehman for cause, because their views would "prevent or substantially impair the performance of [their] duties as a juror in accordance with [their] instructions and [their] oath." *Wilcher*, 863 So. 2d at 814 (quoting *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S. Ct. 844, 83 L. Ed. 2d 481 (1985)).

2. Disqualification Under *Morgan*

¶95.   Batiste also argues that the trial court should have struck four jurors for cause under *Morgan v. Illinois*, 504 U.S. 719, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992). *Morgan* provides that a "juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the

51

instructions require him to do." ***Morgan***, 504 U.S. at 729, 112 S. Ct. at 2229. "[B]ased on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views. If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence." ***Id.*** at 729, 112 S. Ct. at 2229-30.

¶96. Batiste argues that the trial court erred by denying his challenges of Carl Cox, Nancy McGinnis, Robert LaFrance, and Sharon Ingram. Batiste's argument on this issue consists solely of the assertion that "the trial court's ruling on them did not follow the criteria of ***Morgan***, and was therefore legally erroneous." We find no error concerning the four prospective jurors. While Cox initially stated that he believed death was the appropriate punishment for capital murder, he stated that he would impartially follow the jury instructions in determining life or death. McGinnis stated she would determine punishment based on the circumstances and would not favor death over life without parole. LaFrance stated he would not favor death over life, and Ingram stated she could follow the law and the instructions. All four jurors indicated that they would not vote automatically for the death penalty. Therefore, the trial court did not abuse its discretion in denying Batiste's challenges to these jurors for cause.

VII.  WHETHER REVERSAL IS REQUIRED FOR THE ERRONEOUS AND UNCONSTITUTIONAL ADMISSION OF CERTAIN EVIDENCE AGAINST BATISTE AT THE CULPABILITY PHASE OF THE TRIAL.

¶97. Batiste makes several arguments concerning the trial court's admission of evidence during the culpability phase. This Court reviews the trial court's decision admitting or excluding evidence for abuse of discretion. ***Green v. State***, 89 So. 3d 543, 549 (Miss. 2012).

We will not reverse unless the ruling resulted in prejudice to the accused. *Id.*

### A. Testimony of Deputy Steven Woodruff

¶98. Over Batiste's Confrontation Clause objection, the trial court permitted Deputy Woodruff to testify that, at about 5:00 p.m. on March 6, 2008, Galanis had made a complaint that money was missing from his account. In *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), the United States Supreme Court held that the Confrontation Clause prohibits testimonial statements by a witness who did not appear at trial "unless the witness is unavailable to testify, and the defendant had a prior opportunity for cross-examination." *Id*. at 53-54, 124 S. Ct. at 1365. "'Testimony,' . . . is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Id.* at 68, 124 S. Ct. at 1374 (citation omitted).

¶99. Initially, the State sought to admit Woodruff's testimony about the substance of his conversation with Galanis. Batiste made a Confrontation Clause objection to any testimony by Woodruff concerning the conversation between Galanis and Woodruff. During the discussion of the issue, the trial court determined that Galanis's statements to Woodruff constituted testimonial hearsay and were inadmissible under *Crawford*. But later, the State argued that Woodruff's testimony that Galanis had reported the theft to the sheriff's department was admissible to show Batiste's motive for the crime, because it supported the inference that Galanis's action had threatened Batiste. The trial court agreed, finding that the statement was not hearsay, but was admissible to show motive.

¶100. On appeal, Batiste argues that Woodruff's statement was testimonial hearsay that was admitted in violation of the Confrontation Clause. In *Crawford*, however, the Court reiterated

that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Id*. at 59 n.9 (citing *Tennessee v. Street*, 471 U.S. 409, 414, 105 S. Ct. 2078, 2081-82, 85 L. Ed. 2d 425 (1985)). We find that the trial court's ruling was correct, because the statement was not admitted to establish the truth of the matter asserted. Galanis's statement was not admitted to prove as truth that money was missing from Galanis's account, but only to show that Galanis had reported the theft to the authorities. This tended to show that Batiste had felt threatened, and that he had a motive for the crime. Therefore, this use of the statement did not offend the Confrontation Clause, and this issue is without merit.

B. *Testimony of the Bank Employees and Galanis's Mother*

¶101. Batiste filed a motion in limine to exclude the testimony of the bank employees about the statements Galanis had made to them at the bank. He also made a standing objection to all out-of-court declarations of Galanis. The trial court found that Galanis's statements to the bank employees and to his mother were admissible under Mississippi Rule of Evidence 804(b)(5). Rule 804 sets out several hearsay exceptions applicable to statements by an unavailable witness. M.R.E. 804. Rule 804(b)(5), the residual exception, states:

> **(b) Hearsay Exceptions.** The following are not excluded by the hearsay rule if the declarant is not available as a witness:
> . . .
>
> (5) *Other Exceptions*. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A), the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the

54

general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

M.R.E. 804(b)(5).

¶102.  This Court has identified five criteria that must be met before hearsay may be admitted under the residual exception in Rule 804(b)(5):

(1) The adverse party must have notice of intended use; (2) The statement must have circumstantial guarantees of trustworthiness; (3) It must be offered as evidence of a material fact; (4) It must be more probative than other evidence; and (5) The purpose of the rules and the interests of justice must be best served by admitting the statement.

*Randall v. State*, 806 So. 2d 185, 201 (Miss. 2001) (quoting *Butler v. State*, 702 So. 2d 125, 128 (Miss. 1997)). Each requirement must be met before the hearsay statement is admitted. *Randall*, 806 So. 2d at 201.

### 1.  Unavailability/Notice

¶103.  Because Galanis was deceased, he was unavailable under Rule 804(a)(4). It was undisputed that Batiste had notice of the State's intent to present the hearsay statements of Galanis through the bank employees.  However, Batiste complains that, because Galanis's mother was not listed on the State's witness list, the trial court should have excluded her testimony about Galanis's statements. This Court has held that the trial court should determine whether notice was sufficient. *Randall*, 806 So. 2d at 204 (quoting *Cummins v. State*, 515 So. 2d 869, 873 (Miss. 1987) (overruled on other grounds by *Morgan v. State*, 703

So. 2d 832 (Miss. 1997)). "Great latitude is usually allowed depending on the facts and circumstances of each case and the context in which the evidence arises." *Id.* Here, the trial court admitted the testimony because its substance had been disclosed to Batiste in discovery. Thus, although Mrs. Galanis was not on the witness list, the trial court found that Batiste had knowledge of the substance of her testimony and was not unfairly surprised. We find that the trial court was within its discretion in finding that Batiste had sufficient notice of Galanis's mother's testimony.

### 2. Trustworthiness

¶104. For admissibility, the hearsay statement must have circumstantial guarantees of trustworthiness. *Randall*, 806 So. 2d at 205; M.R.E. 804(b)(5). Batiste argues Galanis's declarations to the bank employees were unreliable because they were made to exonerate himself for the withdrawals and to have the money restored to his account. He does not challenge the trustworthiness of Galanis's mother's statements.

¶105. The trial court found the following regarding Galanis's statements to the bank employees: Galanis lacked any motive to lie, given his genuine surprise about the missing money; Galanis was mature and his general character was good because there was nothing to show he had been convicted of crimes of dishonesty; more than one person had heard the statements, and they were spontaneous; the statements were made close in time; Galanis and the bank employees had no close connection that would have led the employees to invent something favorable to Galanis; the risk of the employees' faulty recollection was remote because their statements were taken just days after the event; nothing undermined their credibility; and nothing indicated that suggestive techniques were used to elicit the

56

statements. We find that the trial court did not abuse its discretion by finding that Galanis's statements to the bank employees had circumstantial guarantees of trustworthiness.

### 3. Probative Value, Materiality and the Interests of Justice

¶106. Batiste makes no argument that Galanis's statements lacked probative value, were immaterial, or that their admission did not serve the best interests of justice. Certainly, the statements were probative and material, because they formed the basis of the dispute between Batiste and Galanis. We find that the purpose of the rule and the interests of justice were served by the statements' admission, and that the trial court's admission of the statements was not an abuse of discretion.

¶107. Batiste also argues the statements constituted testimonial hearsay and were inadmissible under the Confrontation Clause. *Crawford* indicated that a statement is likely to be determined testimonial if it was made "with an eye toward" using the statement at trial. *Crawford*, 541 U.S. at 56 n.7.

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis v. Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 2273-74, 165 L. Ed. 2d 224 (2006). "[W]hen a court must determine whether the Confrontation Clause bars the admission of a statement at trial, it should determine the 'primary purpose of the interrogation' by objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs." *Michigan v.*

***Bryant***, ___ U.S. ___, 131 S. Ct. 1143, 1162, 179 L. Ed. 2d 93 (2011).

¶108. Galanis made the statements to the bank employees for the purpose of resolving the problem of money being missing from his account. Galanis made the statements to the bank employees while in the course of his discovering that money was missing and determining what remedies might be available. Galanis did not make the statements "with an eye toward" their use at trial. Because Galanis's statements to Rice and Dailey were not primarily made for a prosecutorial purpose, they were nontestimonial, and their admission did not violate Batiste's Confrontation Clause rights.

C. *Exacerbating Effect on Other Errors*

¶109. Batiste briefly argues that the erroneous admission of Galanis's statements to the bank employees concerning the prior withdrawals from Galanis's account exacerbated the prejudice that resulted from the indictment's failure to specify the items robbed. Presumably, Batiste's contention is that there was a danger that the jurors erroneously believed the elements of robbery were met by Batiste's theft of money from the account. We have found that there was no error in the indictment, that the jury was properly instructed on the elements of robbery, and that the trial court did not abuse its discretion by admitting Galanis's statements to the bank employees. Therefore, we find this issue to be without merit.

D. *Pretrial Identification Procedures*

¶110. Two of the State's witnesses, Candace Dailey and Hewett Rogers, made in-court identifications of Batiste. Dailey, a bank employee, identified Batiste as having been present at the bank with Galanis. Rogers, who worked at the Sherwin-Williams paint store, identified Batiste as the person who had bought paint and rollers from him on the afternoon of the

58

crime. Prior to trial, Batiste moved to exclude the in-court identifications on the ground that they had been tainted by unduly suggestive pretrial identification procedures. After a hearing, the trial court found the that the pretrial identifications were reliable. Batiste argues that this finding constituted an abuse of discretion, and that the pretrial identification and in-court identifications were inadmissible. He also argues that the trial court failed to make the requisite findings on reliability.

¶111. This Court's "standard of review for trial court decisions regarding pretrial identification is 'whether or not substantial credible evidence supports the trial court's findings that, considering the totality of the circumstances, in-court identification testimony was not impermissibly tainted.'" *Outerbridge v. State*, 947 So. 2d 279, 282 (Miss. 2006) (quoting *Roche v. State*, 913 So. 2d 306, 310 (Miss. 2005)). We review a trial court's decision admitting or excluding evidence for abuse of discretion. *Id.* We will reverse the trial court's decision admitting or excluding identification testimony only if it is unsupported by substantial, credible evidence. *Id.* "An accused who seeks to exclude identification testimony based upon an alleged due process violation faces a very heavy burden." *Whitlock v. State*, 47 So. 3d 668, 673 (Miss. 2010) (quoting *York v. State*, 413 So. 2d 1372, 1384 (Miss. 1982)).

¶112. A pretrial identification is impermissibly suggestive if the lineup or series of photographs conspicuously singles out the accused in some manner from the others, either by appearance, or by statements of the officer conducting the lineup or show-up. *York*, 413 So. 2d at 1383 (citing *Foster v. California*, 394 U.S. 440, 89 S. Ct. 1127, 22 L. Ed. 2d 402 (1969); *Simmons v. United States*, 390 U.S. 377, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968)).

59

However, under *Neil v. Biggers*, 409 U.S. 188, 199, 93 S. Ct. 375, 382, 34 L. Ed. 2d 401 (1972), the central question is "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." "An impermissibly suggestive pretrial identification does not preclude in-court identification by an eyewitness who viewed the suspect at the procedure, unless: (1) from the totality of the circumstances surrounding it (2) the identification was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *York*, 413 So. 2d at 1383 (citing *Stovall v. Denno*, 388 U.S. 293, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967); *Simmons v. United States*, 390 U.S. 377, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968)). The factors to be considered in determining the likelihood of misidentification are:

> (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness'[s] degree of attention, (3) the accuracy of the witness'[s] prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, (5) and the length of time between the crime and the confrontation.

*York*, 413 So. 2d at 1383 (quoting *Neil*, 409 U.S. at 199-200, 93 S. Ct. at 382).[7]

¶113. At the hearing, the officers who had conducted the photo lineups testified Dailey and Rogers both were shown different photo arrays with six pictures of African-American males, including Batiste. Batiste moved to exclude the pretrial identifications on the ground that the photo arrays were unduly suggestive and unreliable. The trial court admitted the pretrial identifications.

---

[7] Batiste argues that this Court should adopt New Jersey's new state constitutional standards for evaluating the admissibility of identification testimony, articulated in *State v. Henderson*, 27 A.3d 872 (N.J. 2011). We decline to do so, and will continue to follow the standards set out by this Court and the United States Supreme Court.

¶114. Batiste argues that the trial court did not consider the reliability of the identifications under the totality of the circumstances, but only whether the pretrial identification procedures were unduly suggestive. However, it is obvious from the trial court's ruling that the court considered the totality of the circumstances surrounding the photo lineups in making the determination that they were not unduly suggestive, and it considered the identifications to be reliable. *See York*, 413 So. 2d at 1383. Therefore, this issue is without merit.

¶115. Batiste complains that the photo array shown to Dailey was impermissibly suggestive because Dailey had said that Galanis was accompanied to the bank by one Asian person and one black person, but all the persons in Dailey's photo array were black. The trial court found that the photo array was not impermissibly suggestive, noting that the array had been created using a computer that matched certain characteristics, like height, weight, and skin color. We find that the inclusion of only African-American persons was proper. Although Dailey had said that an Asian person and an African-American person had accompanied Galanis to the bank, the purpose of the lineup was to determine whether Galanis's African-American companion had been Batiste. "The purpose of a photo lineup is to provide witnesses a set of individuals who are similar in physical characteristics so that only someone who was actually familiar with the accused would be able to identify them." *Outerbridge*, 947 So. 2d at 284. The trial court's decision that the lineup was not impermissibly suggestive and was reliable was supported by substantial, credible evidence and was not an abuse of discretion.

¶116. Batiste objected to the Rogers identification because the background of Batiste's photo was lighter than the backgrounds of the other images, rendering the lineup impermissibly suggestive. The trial court overruled the objection, finding that the difference

in color did not render the lineup impermissibly suggestive. In general, courts will find a lineup to be impermissibly suggestive if the defendant is the only one depicted with distinctive features. *Butler v. State*, 102 So. 3d 260, 265 (Miss. 2012). But "'minor differences' with the suspects or differences in the photograph backgrounds will not render a lineup impermissibly suggestive." *Id.* In *Anderson v. State*, the Court of Appeals found that the use of a different photographic technique and a white background around the suspect's photo were minor differences that did not create "a very substantial likelihood of irreparable misidentification." *Anderson v. State*, 724 So. 2d 475, 478 (Miss. Ct. App. 1998) (quoting *York*, 413 So. 2d at 1384). As in *Anderson*, the lighter background of Batiste's photo was a minor difference that did not render the lineup impermissibly suggestive.

¶117.   But even if the lineup was impermissibly suggestive, applying the five-prong test from *Neil*, the identification was not "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *York*, 413 So. 2d at 1383 (quoting *Neil*, 409 U.S. at 199-200, 93 S. Ct. at 382). Rogers had a good opportunity to view and pay attention to Batiste as he interacted with Batiste as a customer at Sherwin-Williams. While there is no evidence regarding Rogers's prior description of Batiste, the officer testified that Rogers did not hesitate when identifying Batiste, displaying certainty. No evidence established the exact length of time between the crime and the identification, but we know that the identification took place sometime during the year and a half between the crime and the trial. Considering the totality of the circumstances, the identification was reliable. We find no error in the trial court's admission of Rogers's identification testimony.

D.      *Batiste's Pretrial Statements: **Miranda** Violation*

¶118. Batiste filed a motion to suppress his two pretrial statements, claiming they were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The trial court held a suppression hearing. At the suppression hearing, the officers who were present at the time of Batiste's statements testified, with the exception of Archer Sallis, who was unavailable because he had been deployed to Iraq. Sheriff Dolph Bryan testified that, immediately after Batiste had been brought to the sheriff's department, Sallis brought Batiste to his office and said "Sheriff, he wants to tell you all about it." Bryan testified that Batiste had nodded his head in the affirmative. Sallis and Batiste sat down, and Bryan told Batiste he had to advise him of his rights and make sure he understood them before he talked to him. Bryan told Batiste he knew Batiste was a smart man, but he was going to read him his *Miranda* rights while Batiste read along on a rights form. After the rights and waiver of rights were read, Batiste assured Bryan he understood his rights, that he knew his rights, and that he was a criminal-justice major. Batiste signed the rights and waiver portions of the form, then gave his first statement. Charlie McVey testified that, after Bryan took Batiste's statement, Sallis asked him to help him take a video statement of Batiste. After waiving his rights, Batiste gave the second statement.

¶119. Batiste argued the statements should have been suppressed based on certain comments Bryan made to Batiste after his arrest, when Batiste was sitting in a patrol car outside the apartment. Bryan testified that McVey called and told him that a student had been killed and he had a suspect in custody. When Bryan arrived at the scene, he walked up to a patrol car, and Batiste was inside. Batiste asked Bryan what was going on. Bryan replied that "he had killed his roommate, that we were not here playing a game, that he was probably fixing to

63

go to the penitentiary for the rest of his life if he didn't get the death penalty." He also told Batiste "that I had a lot of questions to ask him when I got time to ask them." Bryan testified that he said this to Batiste just after 6:00 p.m., and Batiste gave his first statement at 9:35 p.m. Batiste argued that, under *Rhode Island v. Innis*, 446 U.S. 291,100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980), and *Missouri v. Seibert*, 542 U.S. 600, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004), the sheriff's statements had induced his *Miranda* waiver. The trial court found that, despite Bryan's comments, Batiste had knowingly, voluntarily, and intelligently waived his rights prior to giving both statements, and that his statements were freely and voluntarily given.

¶120. Under the Fifth Amendment, a person who undergoes custodial interrogation must first be informed of the right to remain silent and the right to counsel. *Miranda*, 384 U.S. at 467-68, 471, 86 S. Ct. at 1626. "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* at 473-74, 86 S. Ct. at 1627. "If the individual states he wants an attorney, the interrogation must cease until an attorney is present." *Id.* at 474, 86 S. Ct. at 1628.

¶121. *Miranda* warnings must be given before a suspect is subjected to custodial interrogation. "Custodial interrogation" means the suspect is both in custody and undergoing interrogation. "'[I]nterrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301, 100 S. Ct. at 1689-90. The prosecution is prohibited from using statements against the accused obtained in violation of

64

*Miranda*.  *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612.

¶122.  The trial court must consider the totality of the circumstances to determine whether a *Miranda* waiver was knowing, intelligent, and voluntary. *Scott v. State*, 8 So. 3d 855, 861 (Miss. 2008). This Court will reverse the trial court's admission of a confession "if [an] incorrect legal principle was applied; if there was no substantial evidence to support a voluntary, knowing, and intelligent waiver of *Miranda* rights; and if the denial was a result of manifest error." *Id.* Because the standard of manifest error is high, we will not reverse unless the trial court's ruling contravened the substantial weight of the evidence. *Id.*

¶123.  Batiste argues that, before *Miranda* warnings were administered, Bryan interrogated him in a manner that posited his guilt before eliciting incriminating statements from him in violation of *Innis*. We begin by noting that, according to the trial testimony of McVey, he had administered a *Miranda* warning to Batiste at Batiste's arrest, prior to placing him in the patrol car. However, the fact that Batiste had been warned was not before the trial court at the suppression hearing. Therefore, with the assumption that Batiste was unwarned at the time Bryan spoke to him, we proceed to determine whether Bryan interrogated Batiste in a manner that elicited the confession Batiste gave three hours later, after having been administered the *Miranda* warnings and signing a rights-waiver form.

¶124.  The trial court found that Batiste knowingly, intelligently, and voluntarily had waived his *Miranda* rights before confessing. Bryan testified that he spoke to Batiste only after Batiste had asked him what was going on. Bryan responded that Batiste had killed his roommate, that they were not playing a game, that he was about to go to the penitentiary for life and if not, receive the death penalty, and that he would talk to him when he had time.

At that point, the conversation ended. Bryan did not ask Batiste any questions, nor did Batiste volunteer any information. Approximately three hours later, Batiste confessed to Bryan after having been administered the *Miranda* warnings and waiving his rights.

¶125.  Batiste argues that, under *Missouri v. Seibert*, 542 U.S. 600, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004), his statements were tainted by Bryan's earlier comments. *Seibert* held that police may not fail to warn, question the suspect, and obtain a confession, and then administer *Miranda* warnings in hopes of having the accused repeat the confession given prior to the warnings. *Id.* at 617, 124 S. Ct. at 2613. In *Seibert*, the *Miranda* warnings were given mid-interrogation, after the suspect already had confessed. *Id.* at 615, 124 S. Ct. at 2612. But here, Batiste said nothing in response to Bryan's comments. Rather, Batiste gave his first statement approximately three hours later, after he had been transported to the hospital and then to the sheriff's department and administered the *Miranda* warnings, and had signed a rights-waiver form. Prior to waiving his rights, Batiste assured Bryan that he understood his rights; for further emphasis on that point, he stated that he was a criminal-justice major. We find that the trial court did not manifestly err in finding from the totality of the circumstances that Batiste's rights waiver was knowing, voluntary, and intelligent, and the trial court's ruling was supported by substantial evidence.

¶126.  Batiste also argues that his second, videotaped statement was taken without an explicit waiver of rights. This interview took place in the commander's office with McVey and Sallis present.  Before taking the statement, Sallis advised Batiste of his *Miranda* rights and asked Batiste if he understood. In response, Batiste nodded. Sallis read his waiver of rights, and asked if Batiste understood. Batiste nodded. Then, Sallis asked Batiste to sign the rights

waiver form, and Batiste complied. McVey testified that Batiste was behaving very cooperatively.

¶127. Batiste argues that, because Sallis simply asked Batiste to sign the rights-waiver form, Batiste did not effectively waive his rights. The government must show a *Miranda* waiver "was voluntary in the sense that it was the product of a free and deliberate choice." *Berghuis v. Thompkins*,130 S. Ct. 2250, 2260, 176 L. Ed. 2d 1098 (2010) (quoting *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979)). A person may waive his rights without expressly saying so. *Butler*, 441 U.S. at 373, 99 S. Ct. at 1755. We hold that the trial court did not manifestly err in finding that Batiste's affirmative nod and signing of the rights waiver form constituted an effective waiver of his rights.

E. *Seized Evidence*

¶128. Batiste filed a motion to suppress evidence that was seized pursuant to the warrants to search his person, apartment, and vehicle. Justice Court Judge Mills issued these warrants on March 7, 2008, and March 10, 2008. Pursuant to these warrants, the authorities searched Batiste's person on one occasion and his apartment and truck on two occasions. After a hearing, the trial court denied the motion to suppress. On appeal, Batiste argues that, because the warrants to search his body and his vehicle were issued without probable cause, the trial court should have suppressed the evidence seized under the warrants.

¶129. A person's right of freedom from unreasonable searches and seizures is secured by the Fourth Amendment to the United States Constitution and Article 3, Section 23 of the Mississippi Constitution. U.S. Const. amend. IV; Miss. Const. art. 3, § 23. The issuing court may issue a warrant based only upon probable cause, which is determined from the totality

67

of the circumstances. ***Hughes v. State***, 90 So. 3d 613, 628 (Miss. 2012). "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." ***Lee v. State***, 435 So. 2d 674, 676 (Miss.1983) (quoting ***Illinois v. Gates***, 462 U.S. 213, 238-39, 103 S. Ct. 2317, 2332, 76 L. Ed. 2d 527 (1983)). On review of a challenge to the issuance of a search warrant, this Court will affirm if there was a substantial basis for the conclusion that probable cause existed. ***Hughes***, 90 So. 3d at 628.

¶130. At the suppression hearing, it was established that Judge Mills issued the warrants at the request of Deputy McVey. McVey's Affidavit for Search Warrant for the apartment and vehicle contained an Underlying Facts and Circumstances sheet. This sheet described how McVey had come to the apartment at the behest of Galanis's mother, that he had met Batiste and obtained the key to Galanis's room from the office, that Batiste had hurried to get back to the apartment, that he had observed blood spots in Galanis's room, that police had observed more blood spots on the floor of the common area, and that the truck registered to Batiste had been backed up to the building with a blanket spread in the back storage area.

¶131. Further, McVey testified that he orally had told Judge Mills that he had placed Batiste under arrest, that they had found Galanis's body in a wheelbarrow, and that it was a bloody crime scene. Deputy McVey subsequently filed a similar Affidavit for Search Warrant and Underlying Facts and Circumstances sheet to obtain the warrant to search Batiste's person. Deputy McVey testified that Judge Mills had the same information before him when he

issued the warrant to search Batiste's person as he did for the apartment and vehicle.

¶132. Batiste argues that the facts conveyed by McVey to the trial court did not establish probable cause because they did not link him, personally, to the crime. Although Batiste contends that the facts were insufficient to link him to the crime, McVey told Judge Mills that the police had found a body in Batiste's apartment, and that Batiste had behaved suspiciously. He reported that it was a very bloody crime scene, a fact which increased the likelihood that evidence would be found on the person of the perpetrator. He also provided facts that raised a reasonable inference that the vehicle registered to Batiste had been readied for loading the body. Considering the totality of the circumstances, the Underlying Facts and Circumstances sheet and McVey's oral testimony raised a fair probability that evidence of the crime would be found on Batiste's person and in his vehicle. We find that the trial court did not err by finding that there was a substantial basis for the finding of probable cause to issue the search warrants for Batiste's person and vehicle.

*Sentencing Phase*

VIII.   WHETHER THE TRIAL COURT ERRED IN SUA SPONTE ORDERING THAT THE JURY BE REWARDED FOR ITS VERDICT OF GUILT WITH A SPECIAL DINNER AND SPECIAL ACTIVITIES DURING THE BREAK BETWEEN THAT VERDICT AND THE SENTENCING PHASE OF THE TRIAL.

¶133. Batiste complains that, at the conclusion of the guilt phase, the trial court made comments that had the potential to influence the jury's sentencing decision. Specifically, after the verdict of guilt of capital murder, the trial court told the jury:

> BY THE COURT: The verdict is unanimous, and it is in the proper form, and the Court will accept the verdict as the verdict of the jury. It's been a long day, and I know it's been a long week for y'all. What I intend on doing is you know now that we will go to a second phase. We will start that at 9 in

the morning. I'm going to – hopefully, they're going to take you to a good restaurant tonight.

BY THE SHERIFF: Yes, Your Honor.

BY THE COURT: And if we can find some activity for them all to do together. They – they may not want to, but if we can take them somewhere where maybe they can get out of the hotel for a little bit all together, if they want to do that, I – I don't have any problem with that.

BY THE SHERIFF: Yes, Your Honor.

¶134. Batiste argues that the trial court's statements about taking the jurors to a good restaurant and finding an activity for them outside of the hotel gave an imprimatur of approval to the jury's verdict and encouraged them to impose the ultimate punishment. Because Batiste did not object to these statements, this issue is procedurally barred. *Blanchard v. State*, 55 So. 3d 1074, 1077 (Miss. 2011). Further, Batiste cites no relevant precedent in support of his contention. "The [appellant's f]ailure to cite relevant authority obviates the appellate court's obligation to review such issues." *Simmons v. State*, 805 So. 2d 452, 487 (Miss. 2001). Notwithstanding the procedural bar, the issue is without merit, because the trial court's comments cannot be construed reasonably either to convey approval of the jury's verdict or to direct the jury to impose the ultimate punishment.

IX.    WHETHER THE FAILURE TO INSTRUCT THE JURY ON THE INTENT ELEMENT OF ROBBERY ALSO MADE THE IMPOSITION OF THE DEATH SENTENCE A VIOLATION OF THE EIGHTH AMENDMENT AND ARTICLE 3, SECTION 28 OF THE MISSISSIPPI CONSTITUTION.

¶135. In the sentencing phase, the jury was instructed that it could consider as an aggravating circumstance whether the killing was committed during the commission of the crime of robbery. *See* Miss. Code Ann. 99-19-101(5)(d) (Rev. 2007) (stating that

70

"aggravating circumstances [include] . . . the capital offense was committed while the defendant was engaged . . . in the commission of . . . any robbery"). The instructions on the elements of capital murder and robbery used in the guilt phase were sent to the jury in the sentencing phase. The sentencing jury also was instructed that it could consider the proceedings from the guilt phase in reaching its decision.

¶136. Batiste repeats his argument from Issue I that the jury instructions did not require the jury to find that he had the intent to rob. Therefore, he contends, the sentencing jury was permitted to find the aggravating circumstance of robbery without a finding of intent to rob. In Issue I, we held that the jury was properly instructed on the elements of robbery, including on the element of felonious intent. Because the jury was given proper instruction on the crime of robbery, we find that this issue is without merit.

X.     WHETHER, OVER BATISTE'S OBJECTION, THE STATE IMPROPERLY CROSS-EXAMINED HIS SENTENCING-PHASE WITNESS WITH, AND OFFERED REBUTTAL TESTIMONY ABOUT, INADMISSIBLE PRIOR BAD ACTS ALLEGEDLY COMMITTED BY BATISTE.

### A.     Prior Bad Acts

¶137. In 2004, Batiste pleaded guilty to a felony charge of credit-card fraud in Kemper County, which was disposed of with a nonadjudication order. At the sentencing hearing, Batiste offered nine mitigation witnesses, including neighbors, friends, former teachers and school administrators, his high school basketball coach, and a former employer during high school. Each witness offered an opinion of Batiste's good character. Over Batiste's objection, the trial court allowed the State to impeach these witnesses by asking if the witness was aware that Batiste had pleaded guilty to a felony charge of credit-card fraud.

¶138. Batiste argues that the trial court's ruling permitted the jury to draw the improper inference that Batiste had been convicted of credit-card fraud when, in reality, the charge had been disposed of with a nonadjudication order. Batiste did not object to the impeachment on the basis that the jury was permitted to draw an improper inference from the credit-card-fraud charge. Instead, on redirect examination, his counsel repeatedly referred to the charge as a "conviction," thus fostering the very inference of which he now complains. Because Batiste did not specifically object on the basis that the charge had been nonadjudicated, and instead contributed to the problem of which he now complains, we find that Batiste waived his argument that the jury was permitted to draw the improper inference that he was convicted. *Spicer v. State*, 921 So. 2d 292, 305 (Miss. 2006) (the failure to make a contemporaneous objection on one or more specific grounds waives all other grounds).

¶139. Notwithstanding the procedural bar, this issue is without merit. Batiste contends that the danger that the jury drew an improper inference from the impeachment was equivalent to the prosecution's use of false testimony to obtain a conviction. "[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Naupue v. Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 1177, 3 L. Ed. 2d 1217 (1959). In *Naupue*, a State's witness falsely testified that he had received no promise of consideration in exchange for his testimony, when in fact he had been promised consideration. *Id.* at 268, 79 S. Ct. at 1176. This case is distinguishable from *Naupue* because the State did not knowingly introduce false evidence. Rather, the State impeached Batiste's witnesses by asking if they were aware that Batiste had pleaded guilty to credit-card fraud, which was true.

¶140. Batiste also argues that the trial court erred by finding that the credit-card-fraud charge rebutted the evidence of his good character that he elicited on direct examination. Our familiar standard of review of the trial court's admission or exclusion of evidence is abuse of discretion. We will affirm unless the trial court abused its discretion and the erroneous ruling resulted in prejudice to the accused. ***Shaw v. State***, 915 So. 2d 442, 445 (Miss. 2005). Regarding the character of the accused, Mississippi Rule of Evidence 404(a)(1) allows "[e]vidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same." M.R.E. 401(a)(1).

¶141. While Batiste casts his argument in terms of whether the impeachment was "pertinent," in substance, his argument is that the credit-card-fraud charge was not relevant to rebut the evidence of his good character. In the context of a defendant's challenge to the State's use of prior bad acts as impeachment at sentencing, we have held that Section 99-19-101(1) "allows any evidence that the court deems relevant to sentence." ***Wilson v. State***, 21 So. 3d 572, 587 (Miss. 2009) (quoting ***Taggart v. State***, 957 So. 2d 981, 995 (Miss. 2007)). Further, "the State is allowed to rebut mitigating evidence through cross-examination, introduction of rebuttal evidence or by argument." ***Id.*** Batiste argues that the credit-card-fraud charge was too attenuated from the testimony about his general good character to function as rebuttal. We disagree, because the evidence that Batiste had pleaded guilty to credit-card fraud, a charge involving dishonesty, impeached the witnesses' testimony that Batiste generally displayed good character. The trial court's ruling allowing the impeachment was not an abuse of discretion.

¶142. Batiste also complains about the impeachment of his former girlfriend, Vakesha

Hodges. Hodges testified that Batiste had borrowed money from her and always returned what he borrowed. Over Batiste's objection, the State impeached Vakesha by asking if she knew that Batiste had failed to make timely payments on his vehicle. Also over Batiste's objection, the State called the car dealer in rebuttal, who testified that Batiste had failed to make the payments on his vehicle.

¶143. Batiste argues that the trial court should have sustained his objections to this testimony on relevance grounds, or because it was more prejudicial than probative under Mississippi Rule of Evidence 403. The trial court found the evidence was probative and not unduly prejudicial. We find no abuse of discretion in the trial court's ruling. As stated above, Section 99-19-101(1) "allows any evidence that the court deems relevant to sentence." *Wilson*, 21 So. 3d at 587 (quoting *Taggart*, 957 So. 2d at 995). The impeachment of Vakesha and the car dealer's testimony were relevant to rebut the defense's assertion that Batiste always had paid back borrowed money. *See* M.R.E. 402 (relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence"). Under Rule 403, "evidence which is deemed admissible . . . may still be excluded if its probative value is substantially outweighed by the danger of its resultant unfair prejudice." *Jones v. State*, 920 So. 2d 465, 475 (Miss. 2006). "Rule 403 is an ultimate filter through which all otherwise admissible evidence must pass." *Id.* (quoting *Hoops v. State*, 681 So. 2d 521, 531 (Miss. 1996)). The trial court has broad discretion under Rule 403. *Id.* We find no abuse of discretion in the trial court's ruling that the evidence was more probative than prejudicial.

B.     *Golden-Rule Violation*

¶144. Hodges's mother, Sandra Hodges, testified in mitigation. During the prosecutor's cross-examination of Hodges, the following exchange occurred:

Q. If somebody, for example, beat Vakesha – that's your daughter, right?

A. That's – that's my daughter.

Q. If somebody beat her to death, would you think that [the death penalty] was appropriate for them?

Batiste objected to this testimony as improper golden-rule testimony. The trial court overruled the objection without comment. Then, Sandra testified that it was her belief "that the Lord would enable me to forgive that person . . . . Does not necessarily mean that I would think that they should walk the street and be free, but I would hope that I would be able to forgive them to the point where I could say, you know, life in prison or whatever." Sandra further stated "I would hope that I would not be to the point where I felt like they needed to die."

¶145. "Golden rule" arguments, which ask the jury to put themselves in the place of one of the parties, are prohibited. *Chisholm v. State*, 529 So. 2d 635, 639-40 (Miss. 1988). The Court has stated:

It is the essence of our system of courts and laws that every party is entitled to a fair and impartial jury. It is a fundamental tenet of our system that a man may not judge his own case, for experience teaches that men are usually not impartial and fair when self interest is involved. Therefore, it is improper to permit an attorney to tell the jury to put themselves in the shoes of one of the parties or to apply the golden rule. Attorneys should not tell a jury, in effect, that the law authorizes it to depart from neutrality and to make its determination from the point of view of bias or personal interest.

*Id.* (quoting *Danner v. Mid-State Paving Co.*, 252 Miss. 776, 786, 173 So. 2d 608 (1965)).

This Court has found error when, in closing arguments, the prosecutor has asked the jury to

75

put itself in the place of a parent of a child victim of capital murder. *Wells v. State*, 698 So. 2d 497, 507 (Miss. 1997). However, because the improper argument was "sufficiently insignificant in the overall context of the case," the Court found the error was harmless.

¶146. This case does not involve a claim of improper argument, but rather a claim of improper questioning by the prosecution. In *Pitchford v. State*, 45 So. 3d 216, 236 (Miss. 2010), this Court found that a question by the prosecution was "an improper attempt to incite the jurors' emotions and anger." Here, the prosecutor asked that Sandra put herself in the place of a grieving parent of a capital-murder victim for the purposes of giving an opinion on the appropriate punishment. While the prosecutor's question to Sandra did not tell the jury to put itself in the shoes of the victim's mother, the question plainly invited the jury to ponder the question for itself. Certainly, by attempting to elicit golden-rule-type testimony from Sandra, the prosecutor improperly attempted to "incite the jurors' emotions and anger." *See id.* The trial court should have sustained the objection. Nonetheless, we find that no reversible error resulted. "This Court will deem harmless an error where 'the same result would have been reached had [it] not existed.'" *Id.* at 235 (quoting *Tate v. State*, 912 So. 2d 919, 926 (Miss. 2005)). Sandra's testimony that she would aspire to forgive and favor a life sentence was favorable to Batiste. We find that the same result would have been reached without Sandra's testimony and that the error was harmless beyond a reasonable doubt.

XI.     WHETHER THE VICTIM-IMPACT TESTIMONY PRESENTED VIOLATED THE EIGHTH AND FOURTEENTH AMENDMENTS AND SHOULD NOT HAVE BEEN ADMITTED.

¶147. Batiste challenges the introduction at the sentencing phase, over Batiste's objection, of victim-impact testimony of Galanis's mother, Katerina Galanis. "Victim impact statements

76

are those which describe the victim's personal characteristics, the emotional effect of the crimes on the victim's family, and the family's opinions of the crimes and the defendant." *Edwards v. State*, 737 So. 2d 275, 291 (Miss. 1999). The United States Supreme Court has held that there is no *per se* Eighth Amendment bar to victim-impact testimony. *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S. Ct. 2597, 2609, 115 L. Ed. 2d 720 (Miss. 1991). This testimony is admissible at the sentencing phase, but not in the culpability phase. *Havard v. State*, 928 So. 2d 771, 792 (Miss. 2006). We will allow relevant victim-impact testimony in narrow circumstances as is constitutionally permissible. *Id.* When the evidence is proper, necessary to a development of the case and the true characteristics of the victim, and could not incite the jury, the testimony is admissible. *Id.* (quoting *Jenkins v. State*, 607 So. 2d 1171, 1183 (Miss. 1992)). Batiste argues that this Court should bar victim-impact testimony in anticipation that the United States Supreme Court will abrogate *Payne*. We decline to disregard the United States Supreme Court's pronouncement in *Payne*, and will continue to adhere to the standard enunciated above.

¶148. Katerina testified about her relationship with her son, and the impact his death has had on the family. Katerina testified that Galanis had been the protector of the family, and that, after his death, her daughter became involved with a man who had raped her, broken into their home, and stolen items. "The use of victim impact statements that have some probative value, measured against the evidence as a whole, and that are not so inflammatory as to prejudice the defendant have been affirmed by this Court." *Swindle v. State*, 881 So. 2d 174, 177 (Miss. 2004). "Impermissible testimony must be unduly prejudicial and render the trial fundamentally unfair." *Havard*, 928 So. 2d at 792 (citing *U.S. v. Bernard*, 299 F.3d 467,

77

480-81 (5th Cir. 2002)). Katerina's revelation that her daughter had been raped was one fragment of her description of the adverse impact of Galanis's loss on her and her family. In the larger context of the evidence as a whole, it had some probative value. Further, the jury could not reasonably have inferred from Katerina's testimony that Galanis's death had caused the rape of his sister by a third party. We cannot say that Katerina's victim-impact testimony was so inflammatory as to have prejudiced Batiste or to have rendered his trial fundamentally unfair.

XII.   WHETHER THE TRIAL COURT ERRED IN REFUSING THE DEFENDANT'S PROPOSED PENALTY-PHASE INSTRUCTIONS AND RELYING INSTEAD ON A SINGLE OMNIBUS INSTRUCTION SUBMITTED TO IT BY THE STATE THAT WAS DEFICIENT WITHOUT THE REFUSED INSTRUCTIONS.

¶149.   Batiste argues that the trial court erroneously refused several of his penalty-phase instructions and erroneously granted one of the State's penalty-phase instructions. As stated previously, on a challenge to the trial court's grant or denial of a requested jury instruction, we will affirm if the jury instructions, read as a whole, fairly announce the case and create no injustice. *Fulgham*, 46 So. 3d at 323.

*A.     Instruction DA-4*

¶150.   Batiste proffered Instruction DA-4, which instructed the jury that the death penalty is a unique punishment that is final and irrevocable, and that the jury must render a decision free from anger and prejudice. The trial court refused this instruction based on *Thorson v. State*, 895 So. 2d 85, 109 (Miss. 2004). In *Thorson*, the Court ruled that a death-eligible defendant is not entitled to a jury instruction that, in pertinent part, was virtually identical to that requested by Batiste. The instruction requested by Thorson stated that "The death

78

penalty is a unique punishment. It is final and irrevocable. You must render a decision based on the evidence free from passion and prejudice." *Id.* at 109-110.

¶151. The Court in *Thorson* found that the precedent cited by Thorson was not relevant to his claim of entitlement to the instruction. *Id.* at 110 (citing *Woodson v. North Carolina*, 428 U.S. 280, 303-04, 96 S. Ct. 2978, 2991, 49 L. Ed. 2d 944 (1976) ("[D]eath is a punishment different from all other sanctions in kind rather than degree."); *Gregg v. Georgia*, 428 U.S. 153, 187, 96 S. Ct. 2909, 2931, 49 L. Ed. 2d 859 (1976) ("[D]eath as a punishment is unique in its severity and irrevocability."); *Flores v. Johnson*, 210 F.3d 456, 459 (5th Cir. 2000) ("Death is the most final, and most severe, of punishments.")). Because Thorson had cited no relevant authority, his argument was procedurally barred. *Id.* Batiste cites the same irrelevant precedent as the defendant in *Thorson*. Therefore, based on *Thorson*, this issue is procedurally barred.

¶152. Notwithstanding the procedural bar, the issue is without merit. The jury was instructed properly by the trial court to "objectively consider the detailed circumstances of the crime" and the defendant's character. The jury was instructed to "consider and weigh any aggravating and mitigating circumstances" consistent with the requirements of Mississippi Code Section 99-19-101. The jury was instructed properly and completely, and Batiste was not entitled to instruct the jury further that its decision was to be free from anger and prejudice. *See Thorson*, 895 So. 2d at 110.

B. *Instruction DA-45*

¶153. Batiste proffered an instruction that explained the permanence of a life-without-parole sentence. The trial court denied the instruction. On appeal, Batiste cites no authority for the

proposition that such an instruction is required. Therefore, this issue is procedurally barred. *Id.* Notwithstanding the procedural bar, the issue is without merit. This Court specifically has held that, while the jury must be informed of the sentencing options of death or life without parole, no instruction clarifying what life without parole means is necessary. *Gillett*, 56 So. 3d at 518 (citing *Flowers v. State*, 842 So. 2d 531, 556-57 (Miss. 2003)). The jury was informed properly of the sentencing options in this case, and Batiste was not entitled to an explanatory instruction on life without parole.

### C. Instructions SSP-4A and DA-30

¶154. The trial court granted the State's instruction SSP-4A, an omnibus instruction that instructed the jury on weighing the mitigating circumstances versus the aggravating circumstances in accordance with Mississippi Code Section 99-19-101. That instruction stated, *inter alia*, that the death penalty could be imposed if the jury unanimously found "that the mitigating circumstances do not outweigh the aggravating circumstances." Batiste argues this language was improper because it allowed the imposition of the death penalty even if the jurors were at equipoise, because, if the jurors were at equipoise, then the mitigating circumstances would not outweigh the aggravating circumstances. Essentially, Batiste argues that a "tie" cannot go to death.

¶155. We begin by finding that the jury instruction at issue did not instruct the jury that a "tie" must go to death. To the extent that the jury instruction permitted a "tie" to go to death, the United States Supreme Court resolved the issue in *Kansas v. Marsh*, 548 U.S. 163, 173, 126 S. Ct. 2516, 2524, 165 L. Ed. 2d 429 (2006). Like Batiste, Marsh argued that the death penalty could not constitutionally be imposed if the jurors were at equipoise. *Id.* at 171, 126

S. Ct. at 2523. The Court rejected that argument, holding that "Kansas' death penalty statute, consistent with the Constitution, may direct imposition of the death penalty when the State has proved beyond a reasonable doubt that mitigators do not outweigh aggravators, including where the aggravating circumstances and mitigating circumstances are in equipoise." *Id.* at 173, 126 S. Ct. 2524. Batiste argues that *Marsh* is distinguishable because its holding rested on the fact that a mercy instruction was given, and no mercy instruction was given in Batiste's case. Batiste argues that the trial court should have granted his proffered mercy instruction.

¶156.   Contrary to Batiste's contention, the holding in *Marsh* did not rest on the grant of a mercy instruction, but on "the general principles set forth in our death penalty jurisprudence [that] lead us to conclude that the Kansas capital sentencing system is constitutionally permissible." *Id.* at 173, 126 S. Ct. at 2525. *Marsh* did not determine that a mercy instruction is required, but held that "the States enjoy a constitutionally permissible range of discretion in imposing the death penalty." *Chamberlin v. State*, 989 So. 2d 320, 342 (Miss. 2008) (quoting *Marsh*, 126 S. Ct. at 2525). *Marsh* stands for the proposition that "'the States are free to determine the manner in which a jury may consider mitigating evidence,' i.e., whether the evidence should be viewed through the lens of mercy." *Chamberlin v. State*, 989 So. 2d 320, 342 (Miss. 2008) (quoting *Marsh*, 126 S. Ct. at 2525).

¶157.   Further, "this Court has repeatedly held that 'capital defendants are not entitled to a mercy instruction.'" *Id.* (quoting *Jordan v. State*, 728 So. 2d 1088, 1099 (Miss. 1998)). This is because such an instruction encourages a jury verdict based on emotion, whim, and caprice. *Id.* (quoting *Nixon v. State*, 533 So. 2d 1078, 1100 (Miss. 1987) (*overruled on other*

*grounds by **Wharton v. State***, 734 So. 2d 985 (Miss. 1998)). We find that the trial court committed no error in granting the State's omnibus instruction and denying Batiste's proffered mercy instruction.

### D. Various Instructions

¶158. Batiste argues that his constitutional rights were violated by the trial court's denial of four jury instructions on the presumption of life. This Court has held that a defendant is not entitled to a presumption-of-life instruction. "We have repeatedly said that we reject the 'proposition that a defendant should go into the sentencing phase with a presumption that life is the appropriate punishment." ***Gillett***, 56 So. 3d at 514-15 (quoting ***Brown v. State***, 890 So. 2d 901, 920 (Miss. 2004)). The trial court properly denied the instruction.

¶159. Batiste also complains that the trial court erroneously denied five instructions that told the jury how to evaluate the aggravation evidence, nine instructions that advised the jury how to conduct weighing and sentencing, and ten instructions that more specifically defined mitigation and explained how mitigation evidence should be evaluated. The trial court found the mitigation instructions to be duplicative and repetitious in light of the catchall mitigation instruction in the State's omnibus sentencing instruction, and denied the other instructions as unnecessary because the jury had been instructed properly on aggravating circumstances and the weighing process.

¶160. Batiste argues that the denial of these instructions violated his Eighth Amendment rights under ***Abdul-Kabir v. Quarterman***, 550 U.S. 233, 264, 127 S. Ct. 1654, 1675, 167 L. Ed. 2d 585 (2007), and ***Smith v. Texas***, 550 U.S. 297, 127 S. Ct. 1686, 167 L. Ed. 2d 632 (2007). ***Abdul-Kabir*** held that "sentencing juries must be able to give meaningful

consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual." *Abdul-Kabir*, 550 U.S. at 246, 264 S. Ct. at 1664. Under *Smith*, if there is a reasonable likelihood that the jury believed it was not permitted to consider some mitigating evidence, the defendant has demonstrated error. *Smith*, 550 U.S. at 315-16, 127 S. Ct. at 1698.

¶161. The jury was instructed properly on aggravating circumstances, mitigating circumstances, and the weighing process by the omnibus instruction, SSP-4A. Batiste argues that this instruction did not permit the jury to give meaningful consideration to all mitigating evidence. The jury was instructed on mitigation with a catchall instruction that stated:

> [Y]ou must proceed to weigh against the aggravating circumstances you find to exist any of the following mitigation circumstances which you find to exist:
>
> a. Any circumstances you deem mitigating;
>
> b. Any circumstances or combination of circumstances surrounding the offense which reasonably mitigates against the imposition of the death penalty;
>
> c. Any circumstance or combination of circumstances surrounding the Defendant's life and character which reasonably mitigates against the imposition of the death penalty.

¶162. We agree with the trial court that the omnibus instruction was a correct statement of the law regarding mitigation, and that no further instruction was required. This Court has approved of the use of catchall mitigation instructions. "[T]he use of the catch-all instruction eliminates the possibility 'that the jury was unconstitutionally foreclosed from considering all mitigating circumstances.'" *Gillett*, 56 So. 2d at 512 (quoting *Manning v. State*, 735 So. 2d 323, 352 (Miss. 1999)). Further instruction on nonstatutory circumstances is unnecessary,

provided a catch-all instruction is given that allows the jury to consider any factors it deems mitigating. *Id.* at 511. We further find that the requirements of the Eighth Amendment were met in this case because the jury was instructed in manner that permitted it to "give meaningful effect or a 'reasoned moral response' to a defendant's mitigating evidence." *Abdul-Kabir*, 550 U.S. at 264, 127 S. Ct. at 1675. There was no liklihood that the jury failed to consider some of the mitigating evidence. *Smith*, 550 U.S. at 315-16, 127 S. Ct. at 1698.

### E. *Directed Verdict*

¶163. During the jury's deliberations, Batiste moved for a directed verdict based on Mississippi Code Section 99-19-103. Mississippi Code Section 99-19-103 states in part: "If the jury cannot, within a reasonable time, agree as to punishment, the judge shall dismiss the jury and impose a sentence of imprisonment for life." Miss. Code Ann. § 99-19-103 (Rev. 2007). Batiste sought a directed verdict on two occasions, after the jury had been deliberating for two hours, and after they had been deliberating for three hours and still had not reached a verdict. The trial court denied the motions.

¶164. Batiste claims that the trial court erred by denying the motions. However, the determination of what is a reasonable time for deliberation is within the trial judge's discretion. *Id.* This Court previously has held that a four-hour-and-forty-minute deliberative period is not an unreasonable time for deliberation on punishment. *Smith v. State*, 729 So. 2d 1191, 1221 (Miss. 1998). Therefore, we find that the trial court was within its discretion in denying Batiste's motions for a directed verdict.

XIII. WHETHER ALL OF THE AGGRAVATING CIRCUMSTANCES ON WHICH THE JURY WAS INSTRUCTED WERE EITHER LEGALLY OR FACTUALLY UNSUPPORTED, AND BATISTE'S DEATH SENTENCE THEREFORE

INVALID.

¶165. Over Batiste's objections, the trial court instructed the jury on the following three aggravating circumstances, which the jury found: (1) the capital murder was committed during the commission of the crime of robbery; (2) the capital murder was committed for the purpose of avoiding arrest; and (3) the capital murder was especially heinous, atrocious, or cruel. Miss. Code Ann. § 99-19-101(5) (Rev. 2007). Batiste argues that each aggravating circumstance was legally or factually unsupported. We hold that the evidence supported the jury's finding of each statutory aggravating circumstance. Miss. Code Ann. § 99-19-105(3)(b) (Rev. 2007).

   A.    Robbery

¶166. Citing *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), Batiste argues that, because the fact that the killing occurred in the course of a robbery was used to capitalize the offense, it could not be used to aggravate the offense. But we have held "that the alleged felony underlying the capital-murder conviction may properly be used as an aggravator . . . ." *Gillett*, 56 So. 3d at 510 (quoting *Ross v. State*, 954 So. 2d 968, 1014 (Miss. 2007)). "The United States Supreme Court has held that use of an underlying felony as an aggravator is not a constitutional error." *Moffett v. State*, 49 So. 3d 1073, 1116 (Miss. 2010) (citing *Tuilaepa v. California*, 512 U.S. 967, 971-72, 114 S. Ct. 2630, 2634-35, 129 L. Ed. 2d 750 (1994); *Lowenfield v. Phelps*, 484 U.S. 231, 233, 108 S. Ct. 546, 548, 98 L. Ed. 2d 568 (1988)). There was no impediment to the use of the robbery to aggravate the offense.  This issue is without merit.

   B.    *"For the purpose of avoiding arrest"*

85

¶167. The jury found the aggravating circumstance that "[t]he capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody." Miss. Code Ann. § 99-19-101(5)(e) (Rev. 2007). Batiste argues that insufficient evidence supported this aggravating circumstance. We have held that "[i]f there is evidence from which it may be reasonably inferred that a substantial reason for the killing was to conceal the identity of the killer or killers or to 'cover their tracks' so as to avoid apprehension and eventual arrest by authorities, then it is proper for the court to allow the jury to consider this aggravating circumstance." *Gillett*, 56 So. 3d at 505-06 (quoting *Leatherwood v. State*, 435 So. 2d 645, 651 (Miss. 1983)).

¶168. Evidence was before the jury that supported a reasonable inference that Batiste had killed Galanis to avoid arrest or apprehension for his theft of money from Galanis's bank account. But Batiste argues that the avoiding-arrest aggravating circumstance cannot apply if the defendant killed to avoid arrest for a crime other than the underlying felony. He argues that, because there was little evidence that Batiste had killed to avoid arrest for the underlying felony of robbery, there was no evidence to support this aggravating circumstance.

¶169. We have never limited the aggravating circumstance that the crime was committed for the purposes of avoiding arrest to situations where the defendant killed to avoid arrest for the underlying felony. Other courts have determined that this aggravator applies to murders committed to avoid arrest for crimes other than the underlying felony. In *State v. Melson*, 638 S.W. 2d 342, 367 (Tenn. 1982), the Tennessee Supreme Court found that this aggravator was present where a victim was bludgeoned to death after she had threatened to expose the

86

defendant's earlier theft of gasoline. Because there was sufficient evidence that Batiste killed Galanis to avoid arrest or apprehension for his prior theft of money, we find that the evidence was sufficient to support the jury's finding of this aggravating circumstance.

C. Heinous, Atrocious, or Cruel

¶170. The trial court instructed the jury that the jury could consider the aggravating circumstance that "the capital offense was especially heinous, atrocious, or cruel." Miss. Code Ann. § 99-19-101(5)(h) (Rev. 2007). The trial court also gave a limiting instruction defining what the jury could consider in reaching its findings on the HAC aggravating circumstance. This instruction stated that "an especially heinous, atrocious, or cruel Murder is one accompanied by such additional acts as to set the homicide apart from other Murders; a conscienceless or pitiless crime which is unnecessarily torturous to the victim."

¶171. Batiste argues that the limiting instruction was unconstitutionally vague and self-referential, and did not properly limit the aggravator in violation of the Eighth Amendment. In *King v. State*, 960 So. 2d 413, 440 (Miss. 2007), this Court held that, at a minimum, a HAC instruction must define a "heinous, atrocious, or cruel" offense as "a conscienceless or pitiless crime which is unnecessarily torturous to the victim." We noted that, in *Bell v. Cone*, 543 U.S. 447, 125 S. Ct. 847, 160 L. Ed. 2d 881, 893 (2005), the United States Supreme Court held that "this narrowing construction was not unconstitutionally vague." *Id.* (citing *Bell*, 543 U.S. at 458, 125 S. Ct. at 854-55). We find that the limiting instruction was a proper statement of the law.

¶172. Batiste also argues that the evidence was insufficient to support the jury's finding that the killing was especially heinous, atrocious, or cruel. Evidence showed that Batiste brutally

87

beat Galanis to death with a tire iron and a rim adaptor. Dr. Hayne testified that Galanis had suffered thirty-six separate injuries to the head, including a three-inch gash to the top of the head that caused severe injury to the brain. He testified that congestion in Galanis's organs showed that he was alive after the initial blows were struck, and he had injuries to his hands consistent with defensive posturing. Batiste indicated in his statement that he had left Galanis to die. We have held that "'[t]he number of wounds, the number of lethal weapons used to inflict these wounds, and the fact that death was not immediate, but prolonged' may all be considered as evidence supporting a jury's finding of the HAC aggravator." *King*, 960 So. 2d at 441 (quoting *Manning v. State*, 735 So. 2d 323, 349 (Miss. 1999)). We find that sufficient evidence supported the jury's finding of this aggravating circumstance.

> D. *Entitlement to New Sentencing Proceeding*

¶173. Batiste argues that, if this Court finds one of the aggravating circumstances to be invalid, he is entitled to a new sentencing hearing. Because this Court has not invalidated any of the aggravating circumstances, this argument is moot.

XIV. WHETHER THE DEATH SENTENCE IN THIS CASE MUST BE VACATED BECAUSE IT WAS IMPOSED IN VIOLATION OF THE CONSTITUTION OF THE UNITED STATES.

> A. *Indictment*

¶174. Batiste argues that *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 466, 147 L. Ed. 2d 435 (2000), required that his indictment have set forth the aggravating circumstances. He argues that, because the indictment failed to set forth the aggravating circumstances, it did not set forth all of the elements necessary to impose the death penalty in violation of his right to due

88

process under the Fifth and Fourteenth Amendments and his right to notice and a jury trial under the Sixth and Fourteenth Amendments. While Batiste did not raise this argument in the trial court, challenges to the indictment may be raised for the first time on appeal. *Spicer*, 921 So. 2d at 319.

¶175. *Apprendi* states that "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Apprendi*, 530 U.S at 476, 120 S. Ct. at 2355. *Ring* addressed Arizona's death-penalty sentencing scheme, which had allowed the trial judge, sitting alone, to find an aggravating circumstance. *Ring*, 536 U.S. at 592-93, 122 S. Ct. at 2434-35. The Court held that, because Arizona's aggravating factors operated as "'the functional equivalent of an element of a greater offense,' the Sixth Amendment requires that they be found by a jury." *Id.* at 609, 122 S. Ct. at 2443 (quoting *Apprendi*, 530 U.S. at 494 n.19, 120 S. Ct. 2348).

¶176. In *Berry*, we determined that *Apprendi* and *Ring* do not invalidate Mississippi's capital-murder sentencing scheme. *Berry v. State*, 882 So. 2d 157, 172 (Miss. 2004). *Apprendi*'s statement that any fact that increases the maximum penalty must be charged in an indictment relates to the Sixth Amendment right to a jury trial, not to requirements for an indictment. *Havard v. State*, 928 So. 2d 771, 801 (Miss. 2006). Neither *Apprendi* nor *Ring* addressed state indictments. *See Berry v. State*, 882 So. 2d at 170. We have held that "these cases . . . address issues wholly distinct from our law, and do not address indictments at all." *Brown v. State*, 921 So. 2d 901, 918 (Miss. 2004) (citing *Stevens v. State*, 867 So. 2d 219

89

(Miss. 2003)). Batiste argues that *Apprendi* and *Ring* should apply to Mississippi's capital-sentencing scheme after *Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006). Because *Kansas* did not address the requirements for indictments, it does not alter our analysis of this issue. Accordingly, this issue is without merit.

B.       *Enmund* Factors

¶177.  *Enmund v. Florida*, 458 U.S. 782, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 (1982), and *Tison v. Arizona*, 481 U.S. 137, 107 S. Ct. 1676, 95 L. Ed. 2d 127 (1987), require that, to be sentenced to death, a person convicted of capital murder actually must have killed, attempted to kill, intended to kill, or intended that lethal force be used in a felony. Batiste challenges the constitutionality of Mississippi Code Section 99-19-101(7)(d). Section 99-19-101(7) states that:

> In order to return and impose a sentence of death the jury must make a written finding of one or more of the following:
>
> (a) The defendant actually killed;
>
> (b) The defendant attempted to kill;
>
> (c) The defendant intended that a killing take place;
>
> (d) The defendant contemplated that lethal force would be employed.

Miss. Code Ann. § 99-19-101(7) (Rev. 2007).

¶178.  Batiste argues that Section 99-19-101(7)(d) is unconstitutional because it allows the jury to impose a sentence of death if "the defendant contemplated that lethal force would be employed." He argues that the statute unconstitutionally allows the jury to impose a death sentence without a finding of the intent required by *Enmund* and *Tison*. This Court has

determined that Section 99-19-101(7)(d) is constitutional. ***Knox v. State***, 901 So. 2d 1257, 1268 (Miss. 2005). Further, the jury found that all four factors were present in this case.

### C. Constitutionality of Capital-Punishment Scheme

¶179. Mississippi Code Section 99-19-105(3)(c) provides that this Court shall determine whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering the defendant and the crime. Miss. Code Ann. § 99-19-105(3)(c) (Rev. 2007). Batiste argues that Section 99-19-105 is unconstitutional on its face because it fails to provide for adequate or meaningful appellate review in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and corresponding sections of the Mississippi Constitution. Specifically, Batiste argues the statute allows the arbitrary and capricious imposition of the death penalty because it does not provide for consideration of cases where the death penalty was *not* imposed.

¶180. This argument was considered and rejected in ***Lester v. State***, 692 So. 2d 755, 802-03 (Miss. 1997) (*overruled on other grounds by* ***Weatherspoon v. State***, 732 So. 2d 158 (Miss. 1999)). Like Batiste, Lester argued that all cases where the death penalty was not imposed should be considered. *Id.* We found that "the current guidelines are sufficiently specific, and we find no reason to undertake the overwhelming task of considering all death-eligible cases in our review." *Id.* We adhere to our decision in ***Lester*** and find this issue entitles Batiste to no relief.

¶181. Batiste also argues that Mississippi's death-penalty scheme is unconstitutional because it has been applied in a discriminatory and irrational manner in violation of the Eighth Amendment, due process, and equal protection. We note that Batiste admits that the United

91

States Supreme Court has not held that racial and gender disproportion, without more, is sufficient to violate due process and equal protection. Batiste also argues that the death-penalty statutes are unconstitutionally overbroad and vague.[8] He further argues that the death-penalty scheme is unconstitutional because it does not allow the death penalty in cases of simple murder, no matter how premeditated or atrocious. We find that Batiste is entitled to no relief. This Court has held that "the death penalty in Mississippi does not violate the U.S. Constitution." *Gillett*, 56 So. 3d at 525.

*D. Lethal-Injection Protocol*

¶182. Batiste claims Mississippi's lethal-injection protocol violates ***Baze v. Rees***, 553 U.S. 35, 128 S. Ct. 1520, 170 L. Ed. 2d 420 (2008), and constitutes cruel and unusual punishment. Because Batiste failed to challenge the method of execution at trial, this issue is procedurally barred. ***Chamberlin v. State***, 55 So. 3d 1046, 1056 (Miss. 2010). Notwithstanding the procedural bar, this issue is without merit. This Court "has held unequivocally that Mississippi's method of lethal injection does not violate the Eighth Amendment." ***Id.*** (citing ***Bennett v. State***, 990 So. 2d 155, 161 (Miss. 2008)). In ***Chamberlin***, we stated:

> If differences exist between Mississippi's execution protocols and those used in Kentucky, then, the inquiry is whether Mississippi's lethal-injection protocol meets Constitutional muster in light of this recent Supreme Court decision. The Fifth Circuit, when considering inmate Dale Leo Bishop's Eighth-Amendment challenge to Mississippi's lethal-injection procedures, recently announced that "Mississippi's lethal injection protocol appears to be substantially similar to Kentucky's protocol that was examined in ***Baze***." We agree with the Fifth Circuit's analysis, and hold that Bennett's Eighth

---

[8] In his overbreadth/vagueness argument, Batiste again attacks the adequacy of the trial court's limiting instruction on the heinous, atrocious, or cruel aggravator. Because we have found that the instruction is proper, we do not revisit this argument.

92

Amendment challenge to the lethal injection protocol in Mississippi is without merit.

*Chamberlin*, 55 So. 3d at 1056 (quoting *Bennett*, 990 So. 2d at 161) (citations omitted).

XV. WHETHER THE DEATH SENTENCE IN THIS MATTER IS CONSTITUTIONALLY AND STATUTORILY DISPROPORTIONATE.

¶183. Batiste argues that the sentence of death is disproportionate to the crime. Mississippi Code Section 99-19-105(3)(c) requires this Court to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant[.]" Miss. Code Ann. § 99-19-105(3)(c) (Rev. 2007). After reviewing the record in this case and the death-penalty cases listed in the attached appendix, we find that Batiste's death sentence was proportionate to his crime. On numerous occasions, this Court "has upheld the death penalty in cases involving capital murders committed during the commission of a robbery." *Gillett v. State*, 56 So. 3d 469, 524 (Miss. 2010); *see Fulgham v. State*, 46 So. 3d 315, 323 (Miss. 2010); *Goff v. State*, 14 So. 2d 625, 650 (Miss. 2009); *Chamberlin v. State*, 989 So. 2d 320, 345 (Miss. 2008); *Doss v. State*, 709 So. 2d 369, 401 (Miss.1997). Further, we find from our review of the record that the death sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. Miss. Code Ann. § 99-19-105(3)(a) (Rev. 2007).

XVI. WHETHER THE CUMULATIVE EFFECT OF THE ERRORS IN THE TRIAL COURT MANDATES REVERSAL OF THE VERDICT OF GUILT AND/OR THE SENTENCE OF DEATH ENTERED PURSUANT TO IT.

¶184. Batiste argues that the cumulative effect of the errors in this case requires reversal of his conviction and sentence. Under the cumulative-error doctrine, "individual errors, which are not reversible in themselves, may combine with other errors to make up reversible error,

where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial."

***Ross v. State***, 954 So. 2d 968, 1018 (Miss. 2007). We have found that a single, nonreversible error occurred at Batiste's trial. Because only a single error occurred, there are no errors that could combine with other errors to establish cumulative error. This issue is without merit.

## CONCLUSION

¶185.  We affirm Batiste's conviction and sentence.

¶186.  **CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH BY LETHAL INJECTION, AFFIRMED.**

**WALLER, C.J., RANDOLPH, P.J., PIERCE AND COLEMAN, JJ., CONCUR. LAMAR J., CONCURS IN PART AND IN RESULT WITHOUT SEPARATE WRITTEN OPINION.  KITCHENS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J., AND KING, J.**

**KITCHENS, JUSTICE, DISSENTING:**

¶187.  The majority finds that "[t]he State need not prove the defendant had the intent to rob prior to the killing." Maj. Op. ¶33. With respect, I disagree. The longstanding rule in Mississippi regarding intent to commit the underlying felony has always been, until very recently, that it was a jury question to be determined from the facts and surrounding circumstances of the murder. Batiste was not permitted to argue that the facts and circumstances surrounding the death of Galanis did not support an inference that Batiste killed Galanis with the intention of robbing him. Instead, the jury was told that robbery as an "afterthought" to the murder was sufficient to convict. Because I believe that the decision of the majority is the product of a fundamental misapprehension of the relevant and longstanding capital murder jurisprudence of this State, and in clear contravention of the plain language of Mississippi's capital murder statute, I respectfully dissent.

94

¶188. To understand why the State must prove that a defendant intended to rob a victim prior to the victim's death to support a capital murder conviction, it is important to review the purposes and goals underlying what has come to be called the felony murder doctrine. "The purpose underlying the modern felony-murder rule is one of deterrence; the rule is intended to deter dangerous conduct by punishing as a first degree murder a homicide resulting from dangerous conduct in the perpetration of a felony, even if the defendant did not intend to kill." *State v. Allen*, 875 A.2d 724, 729 (Md. 2005). *See also Nay v. State*, 167 P.3d 430, 434 (Nev. 2007) (citing *Allen*, 875 A.2d at 729-30); *State v. Kimbrough*, 924 S.W.2d 888, 890 (Tenn. 1996) ("One of the original purposes of the felony-murder rule was to deter the commission of certain felonies in a dangerous or violent way."); *Commonwealth v. Spallone*, 406 A.2d 1146, 1147-48 (Pa. Super. Ct. 1979) ("The purpose of the rule is to deter one about to commit a felony in which a reasonable man knows, or should know, that death may result, by making him criminally responsible for any such deaths."). This Court has espoused a similar view. "[T]he purpose of the felony-murder statute is to reduce the disproportionate number of accidental homicides which occur during the commission of the enumerated *predicate* felonies by punishing the party responsible for the homicide not merely for manslaughter, but for murder . . . ." *Smith v. State*, 499 So. 2d 750, 754 (Miss. 1986) (quoting *People v. Miller*, 297 N.E.2d 85, 87-88 (N.Y. 1973) (emphasis added)). This view is reflected in the plain language of the statute itself. A person is guilty of murder with the underlying felony of robbery if he kills a human being "*with or without any design to effect death* . . . [while] engaged in the commission of the crime of . . . robbery, . . . or in any attempt to commit [robbery]." Miss. Code Ann. 97-3-19 (Rev. 2006) (emphasis added).

¶189.   The concept of felony murder was instituted to provide a sort of strict criminal liability for deaths occurring during the commission of certain enumerated crimes. It is important to deter criminals who are willing to engage in certain crimes from recklessly or willfully taking or endangering human life to further those crimes. In that context, it becomes abundantly clear that the intent to rob someone must form in a killer's mind before the victim is killed in order for that person to be guilty of murder with the underlying felony of robbery. Other jurisdictions which have addressed this question have come to the same conclusion.

> [W]here an actor kills prior to formulating the intent to commit the underlying felony, we cannot say the actor knew or should have known death might occur from involvement in a dangerous felony because no involvement in a dangerous felony exists since the intent to commit the felony is not yet formulated. Also, the greater deterrent is not necessary, and the rule has no application.

*Commonwealth v. Legg*, 417 A.2d 1152, 1154 (Pa. 1980); *see also State v. Buggs*, 995 S.W.2d 102, 107 (Tenn. 1999) (stating that "the rationale for the felony murder rule underlies the requirement" that the intent to commit a crime must occur prior to the victim's death for the defendant to be guilty of capital murder in the majority of jurisdictions that enforce that rule). The purpose is to punish those who intend to commit a crime, and are willing to kill or recklessly endanger life to accomplish their goal. This is why the majority of U.S. jurisdictions require that the defendant must have formed an intention to commit the underlying felony when the murder occurred.[9] Under the majority's analysis, in which the

---

[9] *See e.g.*, *United States v. Bolden*, 514 F.2d 1301, 1309 (D.C. Cir. 1975); *Ex parte Johnson*, 620 So. 2d 709, 713 (Ala. 1993) (stating that a robbery committed as a mere afterthought and unrelated to the murder will not sustain a conviction of felony murder); *Todd v. State*, 884 P.2d 668, 683 (Alaska 1994) ("[T]he defendant's intent to commit one of the listed felonies constitutes the culpable mental state that makes any resulting homicide murder . . . ."); *Grigsby v. State*, 542 S.W.2d 275, 280 (Ark. 1976) ("We find no room for

timing of the intent to rob is irrelevant to guilt of felony murder, the deterrent purpose of our

capital murder statute is not served. The only thing that is accomplished by such a rule is that

those who already are willing to kill someone will think twice about taking the victim's

property after the murder.

¶190.   Perhaps the most powerful argument against the majority's interpretation of our capital

murder statute is the language of the statute itself. "If [a statute] is not ambiguous, the court

should simply apply the statute according to its plain meaning. . . ." *City of Natchez v.*

*Sullivan*, 612 So. 2d. 1087, 1089 (Miss. 1992). Under the plain language of the statute, a

person is guilty of capital murder if, "with or without design to effect death," the person kills

a human being "*while engaged in the commission of the* [*underlying*] *crime*." Miss. Code Ann.

§ 97-3-19 (Rev. 2006) (emphasis added). In my view, the only logical reading of this language

indicates that the victim must be killed contemporaneously with the intent or attempt to

---

quarrel with appellant's assertion that larceny from the body of one killed, as an afterthought, would not constitute a capital felony."); *People v. Ainsworth*, 755 P.2d 1017, 1037 (Cal. 1988) ("Under the felony-murder rule, the evidence must establish that the defendant harbored the felonious intent either prior to or during the commission of the acts which resulted in the victim's death.") (citation omitted); *People v. Brannon*, 486 N.W.2d 83, 85-86 (Mich. App. 1992), *app. denied*, 495 N.W.2d 384 (Mich. 1992) ("It is not necessary that the murder be contemporaneous with the enumerated felony. The statute requires only that the defendant intended to commit the underlying felony at the time the homicide occurred."); *State v. Newman*, 605 S.W.2d 781, 787 (Mo. 1980) (approving jury instruction stating defendant must have had intent to commit underlying felony when killing occurred); *State v. Montgomery*, 215 N.W.2d 881, 883 (Neb. 1974) ; *People v. Joyner*, 257 N.E.2d 26, 27 (N.Y. 1970); *Commonwealth v. Legg*, 417 A.2d at 1154; *Buggs*, 995 S.W.2d at 106 ("[I]n a felony-murder case, intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the death of the victim . . . ."); *Robertson v. State*, 871 S.W.2d 701, 705 (Tex. Crim. App. 1993) ("In order for the murder to qualify as capital murder . . . the intent to rob must be formed prior to or concurrent with the murder.")

commit the underlying felony. To be sure, the intent to commit the underlying crime may form much earlier than the murderous act, and the victim's death may occur after the underlying felony is completed;[10] but the bottom line is this: the actions which cause the victim's death must be done while the perpetrator is engaged in the commission of one or more of the felonies listed in the statute. The intent to commit the underlying felony must have formed in the mind of the defendant before the victim's death. If a human being is killed for a reason completely unrelated to any of the enumerated underlying felonies, it simply cannot be said that the killer struck "while engaged in the commission of the crime."

¶191. The majority finds that the trial court properly instructed the jury that "the phrase 'while engaged in the commission of' includes the attempt to commit the crime, the complete crime, as well as the immediate post crime acts of the defendant. . . ." Maj. Op. ¶ 35. As explained below, that interpretation of the phrase consistently had been used by this Court to mean that acts by the defendant surrounding the commission of the crime could be used to *support* an inference that the defendant was engaged in the underlying crime when the victim was killed. Now, the majority holds that any potential crime committed before, during, or after the victim's death such that the two form a continuous chain of events makes the defendant guilty *per se* of capital murder. The majority's interpretation of our capital murder statute is an extreme expansion of the plain language of the statute. It was invented by this Court – not by the Legislature – and I, respectfully, cannot agree with it.

¶192. Until this Court's decision in **Gillett v. State**, 56 So. 3d 469 (Miss. 2010), Mississippi

---

[10]For example, killing a victim after committing the crime to aid in escape and avoid identification and punishment still would be done in furtherance of the underlying crime.

98

juries were required to weigh competing evidence to determine whether the defendant possessed the requisite intent to commit the underlying felony before the death of the victim. An analysis of our capital murder jurisprudence up to that point is necessary to illustrate that Mississippi required an intent to rob to form before the death of the victim to support a conviction for capital murder, and that the jury was permitted to weigh the evidence and infer from the evidence whether the requisite intent existed when the murder occurred.

¶193. The progenitor of our current approach to felony murder is this Court's decision in *Pickle v. State*, 345 So. 2d 623 (Miss. 1977). The defendant in that case was charged with capital murder with the underlying felony of rape. *Id.* at 625. He argued that, in order to be guilty of capital murder, the State would have had to prove that the rape was committed "while effecting the death of the victim . . . ." *Id.* This Court held that "where the two crimes are connected in a chain of events and occur as part of the res gestae, the crime of capital murder is sustained." *Id.* at 627. In reaching its conclusion, the Court relied in part on two other state court decisions, *MacAvoy v. State*, 15 N.W.2d 45 (Neb. 1944), and *Lipscomb v. State*, 165 A.2d 918 (Md. 1960).[11] In *MacAvoy*, in holding that a murder which could have occurred after the rape was completed was sufficient to charge the defendant with felony murder, the Nebraska Supreme Court held that a killing "committed within the res gestae of the felony charged" is sufficient to support a charge of felony murder. *MacAvoy*, 15 N.W.2d at 832-33. In *Lipscomb*, the Maryland court held that "it would make no difference as to guilt

---

[11]Both Maryland and Nebraska require the state to prove that the defendant intended to rob the victim before the victim's death to support a conviction for felony murder. *See State v. Allen*, 875 A.2d 724, 729 (Md. 2005); *State v. Montgomery*, 215 N.W.2d 881, 883 (Neb. 1974).

under the above statute whether death occurred after the rape had been accomplished or in an attempt to perpetrate it." ***Lipscomb***, 165 A.2d at 922.

¶194. This Court found the reasoning in those cases persuasive. It apparently was moved by a concern that without a "res gestae" rule, the State would be forced to prove that the killing and the felony coincided in time, and that would actually give criminals incentive to kill their victims after the crime was completed.

> If the crime of capital murder could not be sustained unless the homicide occurred during the actual attack upon a victim or during the actual burglary, kidnapping, arson or robbery, such could be an inducement for an assailant to kill his victim after the commission of the first crime in order to silence her/him as a witness. The rule stated in the foregoing cases is the more reasonable, and we hold that where the two crimes are connected in a chain of events and occur as part of the res gestae, the crime of capital murder is sustained.

***Pickle***, 345 So. 2d at 626-27. In essence, the Court in ***Pickle*** held that a defendant did not literally have to be killing the victim while simultaneously committing one of the specified felonies to be guilty of capital murder. Instead, it correctly stated that the two crimes have to be part of the same transaction, connected in a chain of events and occurring as part of the *res gestae*, to *support a conviction* for felony murder.

¶195. For more than twenty years after this Court's decision in ***Pickle***, Mississippi required the State to prove beyond a reasonable doubt that a defendant accused of murder with the underlying felony of robbery had intended to rob the victim *before* the killing occurred. "To be clear, our 'continuous transaction' doctrine as applied to robbery requires the existence of the intent to rob *at a point prior* to the death of the victim." ***Arthur v. State***, 735 So. 2d 213, 220 (Miss. 1999) (Banks, J., concurring) (emphasis added) (citing ***Duplantis v. State***, 708 So. 2d 1327, 1342 (Miss. 1998)). The question this Court faced many times after the decision in

100

***Pickle*** was not whether the timing of the intent was irrelevant, but whether the facts and circumstances surrounding the victim's death supported an inference that the intent to rob had formed in the defendant's mind before the victim's death.

¶196.  In 1978, a little more than a year after ***Pickle***, this Court decided ***Voyles v. State***, 362 So. 2d 1236 (Miss. 1978). There, the defendant was convicted of capital murder with the underlying felony of robbery. ***Id.*** The defendant argued that the evidence did not support the jury's finding beyond a reasonable doubt that he had intended to rob the victim before he killed her. ***Id.*** at 1242. The evidence showed that the defendant and victim had been dating for two months, that the defendant had told his nephew that "he had killed the [victim] because she wouldn't put the car in his name," and that the two previously had gotten into an argument because the victim would not let the defendant have her car. ***Id.*** at 1243. In determining that the evidence was sufficient to support a conviction, the Court stated "[t]he record is devoid of *any other reason* for the killing, and this Court cannot say that there is any other reasonable hypothesis upon which to reverse the jury's findings." ***Id.*** (emphasis added). Also, the Court approved the jury instructions which stated "that it was necessary for [the jury] to find that appellant *had the intent to rob when the act of killing was done*." ***Id.*** (emphasis added). Clearly, the Court found it important that the "reason" for the murder be tied to the underlying felony. Just as clearly, the Court stated that the jury had to find the defendant had intended to rob the victim *when he killed her*.

¶197.  In ***West v. State***, 553 So. 2d 8 (Miss. 1989), the defendant was charged with capital murder with the underlying felony of sexual battery. West argued that the victim was dead when he committed the sexual battery. ***Id.*** at 13. This Court cited cases of other jurisdictions

which reasoned that, "because the use of force is an essential element to the crime of rape, the use of deadly force, *if done with the intent to coerce the victim into engaging in a sexual act*, satisfies the factual nexus between the killing and the underlying felony to elevate the killing to a capital crime." *Id.* (emphasis added). Importantly, the Court noted that "the underlying crime begins where an indictable attempt is reached." *Id.* (quoting *Pickle*, 345 So. 2d at 626). In finding that the evidence was sufficient to support a capital murder conviction, the Court stated that there was "certainly evidence in this record *from which the jury could have found* [the victim] *alive* when West's assault reached this point." *Id.* (emphasis added). The Court concluded that the "consummation of the underlying felony" after the victim's death did not "vitiate the capital charge." *Id.*

¶198. Again, it is clear in *West* that this Court required the intent to commit the underlying crime to have formed before the death of the victim. The use of force had to be "done with the intent to coerce the victim into engaging in a sexual act." *Id.* The Court differentiated between an "indictable attempt," which had to occur before the victim's death, and the "consummation of the underlying felony," which could occur after the victim's death. *West* stood for the proposition that the intent to commit the underlying felony had to form in the defendant's mind before the victim's death, that the full crime could be "consummated" after the victim's death, and that the jury was to determine whether the evidence supported an inference that the reason for the use of force was to perpetuate the underlying crime.

¶199. In case after case, this Court strongly subscribed to the position that the intent to commit the underlying felony had to have formed in the defendant's mind before the victim's death, and it was a jury question with respect to whether the evidence supported such a

finding.

> Intent to do an act or commit a crime is also a question of fact to be gleaned by the jury from the facts shown in each case. The intent to commit a crime or to do an act by a free agent can be determined only by the act itself, surrounding circumstances, and expressions made by the actor with reference to his intent.

*Wheat v. State*, 420 So. 2d 229, 238 (Miss. 1982) (quoting *Shanklin v. State*, 290 So. 2d 625, 627 (Miss. 1974)). In *Wheat*, the defendant contended that the evidence was insufficient to show that he had intended to rob the murder victim. *Id.* The Court found that, considering the position of the victim, the injuries to the victim, and the fact that the defendant was found in possession of the victim's car, whether the defendant had robbed the victim of his car was a question for the jury. *Id.* at 239. *See also Fisher v. State*, 481 So. 2d 203, 212-14 (Miss. 1985) (holding that the circumstantial evidence permitted a reasonable juror to find beyond a reasonable doubt and to the exclusion of every reasonable hypothesis that defendant was guilty of rape and robbery); *Walker v. State*, 671 So. 2d 581, 593-96 (Miss. 1995) (finding that the evidence was sufficient to support capital murder with underlying felony of rape conviction because jury could have inferred that victim "was still clinging to life" when sexual battery occurred); *Duplantis v. State*, 708 So. 2d 1327, 1342 (Miss. 1998) (evidence supported an inference that the defendant, an escapee from jail, "first developed the intent to rob [the victim] . . . and then killed [the victim] when he did not cooperate," and so jury was justified in finding intent to rob when victim's death occurred); *Arthur v. State*, 735 So. 2d 213, 219 (Miss. 1999) (jury permitted to infer that robbery was a "total afterthought" to murder and therefore no indictable attempt to rob began until the victim was dead; "therefore, no continuous transaction linking Arthur with the murder"); *Knox v. State*, 805 So. 2d 527,

103

532 (Miss. 2002) (finding that circumstantial evidence showing defendant possessed victim's car keys supported jury's finding that State had proved elements of robbery beyond a reasonable doubt).

¶200. The unifying factor in all of the cited cases is that circumstantial evidence existed to show that each defendant had possessed the intent to commit the underlying felony when the victim's death occurred. It was properly the province of the jury to weigh the circumstantial evidence against any arguments of the defendant in an effort to establish a reasonable alternate hypothesis, and to determine whether the State had proven that the defendant possessed the requisite intent to commit the crime before the victim's death. Appropriately, the claimed intent could be supported by "the actions of the defendant leading up to the felony, the attempted felony, and flight from the scene of the felony." *West*, 553 So. 2d at 13. Also, the consummation (but not the intent) of the felony could occur after the victim's death. "It is not necessary that the victim be deprived of property prior to death to sustain a conviction for robbery." *Knox*, 805 So. 2d at 531. *Walker* evidenced yet again that the State is required to prove that the intent to commit the underlying felony had to form before the victim's death, and that the defendant was permitted to argue other alternatives. "Fully considering the surrounding circumstances of [the victim's] murder, Walker was unsuccessful for obvious reasons *in convincing the jury that he formed the intent to commit the sexual battery only after killing Edwards*." *Walker*, 671 So. 2d at 595 (emphasis added). Our capital murder jurisprudence was clear that the intent to commit the predicate felony had to have formed before the victim's death, that such intent could be inferred from the surrounding facts and circumstances, and that the timing of the actual *commission* of the underlying offense was

104

irrelevant with respect to the victim's death.

¶201. This interpretation of Mississippi was consistently applied by this Court through and including the recent capital murder cases decided by this Court in *Spicer v. State*, 921 So. 2d 292 (Miss. 2006), and *Goff v. State*, 14 So. 3d 625 (Miss. 2009). In *Spicer*, the defendant had moved for a directed verdict, arguing that his having been in possession of the victim's truck could not support the jury's verdict that he had robbed the victim. The Court cited *Knox*, 80 So. 2d at 531, in holding that "possession of a deceased's property creates a reasonable inference that the property was stolen." *Spicer*, 921 So. 2d at 311-12. The Court found that the post-death possession of the victim's property supported the jury's verdict. *Id.* It did *not* announce that the timing of the intent to rob the victim was irrelevant, and that the State did not have to prove that the defendant had intended to rob the victim before the victim's death. Instead, this Court simply said the issue was one for the jury, and that the circumstantial evidence in this case *supported* a guilty verdict.

¶202. Similarly, in *Goff*, the defendant was charged with murder with the underlying felony of robbery because the victim's wallet was found in his car. *Goff*, 14 So. 3d at 646. Goff contended that he had been with the victim for some time, that she had left her wallet in the vehicle before her death, and that no proof was adduced to show that he intentionally had robbed her of the wallet. *Id.* In affirming the jury's verdict, this Court *again* stated that the weighing of the circumstantial evidence regarding the intent to rob and the robbery itself were within the province of the jury. *Id.* at 648. The Court found that Goff's argument did have some value, since the evidence did not "leave indifferent" his offered alternative hypothesis. *Id.* However, the evidence weighed against him, and nothing pointed "in favor of Goff with

105

sufficient force that no rational trier of fact could have found this essential element of the crime beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis consistent with innocence." *Id.* The jury did not buy it, but Goff was permitted to argue that he had not formed the intent to rob the victim before her death; and had he persuaded the jury of his theory of the case, he would not have been convicted of capital murder.

¶203. To summarize, as recently as this Court's decision in *Goff*, the intent to commit the underlying felony in a capital murder case had to be proved to have existed in the mind of the defendant *before* the victim's death. To prove such intent, the State could offer evidence of the acts and statements of the defendant before the crime, during the crime, and after the crime which supported his conviction of capital murder. The defendant was permitted to offer his own evidence to show that he had not possessed the requisite intent to commit the underlying felony. It was within the province of the jury to weigh the facts and circumstances and determine whether the State had proved its case beyond a reasonable doubt. The majority contends that requiring the State to prove that Batiste had the intent to rob Galanis before the murder would force this Court "to abandon settled law governing capital-murder convictions." Maj. Op. ¶33. As stated above, the "settled law" in Mississippi was, until 2010, that the State was required to prove that the defendant had intended to commit the underlying felony prior to the victim's death.

¶204. In concluding that "the State need not prove the defendant had the intent to rob prior to the killing[,]" the majority cites *Gillett v. State*, 56 So. 3d 469 (Miss. 2010). *Gillett* represented a significant departure from our established capital murder jurisprudence. There, the defendant was convicted of murdering two people, then stealing the vehicle of one of the

victims several days after the murders occurred. *Id.* at 476. The "robbery" of the truck was the underlying felony which the State contended elevated Gillett's crime to capital murder. *Id.* The jury instructions, to which Gillett objected, stated that the jury had to find Gillett guilty of capital murder if the State showed that he killed the victims and then took the female victim's personal property (her truck), and that the two crimes were part of a continuous chain of events. *Id.* at 491. In approving the jury instructions, the majority relied on the "one-continuous-transaction" rule, which states that "where the two crimes . . . are connected in a chain of events and occur as part of the res gestae, the crime of capital murder is sustained." *Id.* at 492 (citing *Pickle*, 345 So. 2d at 627). Saying that "the intent to rob . . . can be shown from the facts surrounding the crime," and that the jury may infer that the defendant intended to rob the victim when he is discovered in possession of the victim's property, the majority stated that the trial court did not abuse its discretion in granting the jury instructions tendered by the State. *Gillett*, 56 So. 3d at 492-93.

¶205. The cases cited by *Gillett* in reaching its conclusion stood for the proposition that two crimes connected in a continuous chain of events could support a finding by the jury that the defendant was guilty of capital murder when considering all of the facts and circumstances surrounding the crime (e.g., acts of the defendant leading up to the felony, during the commission of the felony, and flight from the scene of the felony). *See Pickle*, 345 So. 2d at 627; *West*, 553 So. 2d at 13; *Walker v. State*, 913 So. 2d 198, 224 (Miss. 2005). The Court took the proposition that such evidence *supported* a capital murder conviction, and then expanded the doctrine to mean that such evidence *required* a murder conviction. In one fell swoop, the necessity of proving intent to commit the underlying crime in advance of the

107

victim's death was dismissed, and what had constituted only a *prima facie* case for capital murder suddenly became an airtight conviction. With that, I cannot agree. ***Gillett*** was a significant departure from the long-settled capital felony murder jurisprudence of this state, and its application in this case or any other runs counter to the established purpose of our felony murder law.

¶206. Here, the jury instructions stated that Batiste had to have been "engaged in" the crime of robbery when Galanis was killed. However, the defense was forbidden from arguing that Batiste had lacked the intent to rob Galanis when he was killed, and so Batiste could not have been engaged in the crime of robbery. The State argued that no intent to rob had to have formed in the mind of Batiste before he murdered Galanis, and the trial court agreed. Again, in closing, the prosecution stated that the robbery could be a mere "afterthought," and the conviction of capital murder could still be sustained. This is plainly incorrect. The majority states that the remark was made "in the context of describing how the one-continuous-transaction rule applied to the case." Maj. Op. ¶ 39. However, the one-continuous-transaction rule merely *supports* a conviction of capital murder, it does not *mandate* one, which is what the State was arguing, and this is the position the trial court took when it refused the defense's "intent" argument.

¶207. Before ***Gillett***, the State would have had a strong *prima facie* case of capital murder against Batiste; but in light of the flawed reasoning of that case, its burden of proof has been significantly lessened. Batiste should have been permitted to offer his alternate theory regarding his intent when he killed Galanis: that, before or during his killing of the victim, no intent to rob him had formed in his mind. The jury should have been permitted to weigh this

argument, along with the State's, and after considering all of the facts and circumstances surrounding the murder, determine whether the State had proved beyond a reasonable doubt that Batiste intended to kill Galanis for the purpose of robbing him, or whether Batiste's alternate hypothesis was believable. This procedure was followed in this State until this Court's incorrect departure from it in **Gillett**, and it is the only way to ensure that the purpose of the felony murder rule is served by severely punishing those who are willing to kill while committing one of the underlying felonies. The concepts of the one-continuous-transaction rule and intent to commit the predicate underlying felony are not incompatible. The murder and crime forming one continuous transaction establish a baseline for a capital murder case, and the facts and surrounding circumstances must be used by the State to prove that the defendant committed the murder while engaged in the commission of the underlying crime. Instead, under the Court's ruling today, what once merely supported a conviction for felony murder now mandates one.

¶208. In short, the State should have to prove that a defendant in a capital murder case formed the intent to commit the underlying felony before the victim's death. Not to require this neuters the purpose of the felony murder statute. Two crimes occurring as part of a continuous chain of events should *support* a conviction of capital murder, not mandate one. A defendant should be permitted to offer evidence and arguments that he did not have the requisite intent to commit the underlying felony before the victim's death, and the jury should determine whether the defendant was "engaged in the commission of the crime . . . of robbery" when the victim's death occurred, as required by our capital murder statute. None of these things happened in this case, and I therefore respectfully dissent. The jury was

109

improperly instructed on the intent element of the capital murder charge. The jury was properly instructed on the lesser-included offense of murder, and the State adduced sufficient evidence to sustain a murder conviction. Accordingly, I would reverse and render the conviction of capital murder, and remand the case for sentencing on the conviction of the lesser-included offense of murder.

**DICKINSON, P.J., AND KING, J., JOIN THIS OPINION.**

## APPENDIX

## DEATH CASES AFFIRMED BY THIS COURT

*Roger Lee Gillett v. State,* 56 So. 3d 469 (Miss. 2010).

*Moffett v. State,* 49 So. 3d 1073 (Miss. 2010).

*Goff v. State,* 14 So. 3d 625 (Miss. 2009).

*Wilson v. State*, 21 So. 3d 572 (Miss. 2009).

*Chamberlin v. State,* 989 So. 2d 320 (Miss. 2008).

*Loden v. State,* 971 So. 2d 548 (Miss. 2007).

*King v. State,* 960 So. 2d 413 (Miss. 2007).

*Bennett v. State,* 933 So. 2d 930 (Miss. 2006).

*Havard v. State,* 928 So. 2d 771 (Miss. 2006).

*Spicer v. State,* 921 So. 2d 292 (Miss. 2006).

*Hodges v. State,* 912 So. 2d 730 (Miss. 2005).

*Walker v. State,* 913 So. 2d 198 (Miss. 2005).

*Le v. State,* 913 So. 2d 913 (Miss. 2005).

*Brown v. State,* 890 So. 2d 901 (Miss. 2004).

*Powers v. State* 883 So. 2d 20 (Miss. 2004)

*Branch v. State,* 882 So. 2d 36 (Miss. 2004).

*Scott v. State,* 878 So. 2d 933 (Miss. 2004).

*Lynch v. State,* 877 So. 2d 1254 (Miss. 2004).

*Dycus v. State,* 875 So. 2d 140 (Miss. 2004).

*Byrom v. State,* 863 So. 2d 836 (Miss. 2003).

*Howell v. State,* 860 So. 2d 704 (Miss. 2003).

*Howard v. State,* 853 So. 2d 781 (Miss. 2003).

*Walker v. State,* 815 So. 2d 1209 (Miss. 2002). *following remand.

*Bishop v. State,* 812 So. 2d 934 (Miss. 2002).

*Stevens v. State,* 806 So. 2d 1031 (Miss. 2002).

*Grayson v. State,* 806 So. 2d 241 (Miss. 2002).

*Knox v. State,* 805 So. 2d 527 (Miss. 2002).

*Simmons v. State,* 805 So. 2d 452 (Miss. 2002).

*Berry v. State,* 802 So. 2d 1033 (Miss. 2001).

*Snow v. State*, 800 So. 2d 472 (Miss. 2001).

*Mitchell v. State,* 792 So. 2d 192 (Miss. 2001).

*Puckett v. State,* 788 So. 2d 752 (Miss. 2001). * following remand.

*Goodin v. State,* 787 So. 2d 639 (Miss. 2001).

*Jordan v. State,* 786 So. 2d 987 (Miss. 2001).

*Manning v. State,* 765 So. 2d 516 (Miss. 2000). *following remand.

*Eskridge v. State,* 765 So. 2d 508 (Miss. 2000).

*McGilberry v. State,* 741 So. 2d 894 (Miss. 1999)**.**

*Puckett v. State,* 737 So. 2d 322 (Miss. 1999). *remanded for *Batson* hearing.

*Manning v. State,* 735 So. 2d 323 (Miss. 1999). *remanded for *Batson* hearing.

*Hughes v. State,* 735 So. 2d 238 (Miss. 1999).

*Turner v. State,* 732 So. 2d 937 (Miss. 1999).

*Smith v. State,* 729 So. 2d 1191 (Miss. 1998).

*Burns v. State,* 729 So. 2d 203 (Miss. 1998).

*Jordan v. State,* 728 So. 2d 1088 (Miss. 1998).

*Gray v. State,* 728 So. 2d 36 (Miss. 1998).

*Manning v. State,* 726 So. 2d 1152 (Miss. 1998).

*Woodward v. State,* 726 So. 2d 524 (Miss. 1997).

*Bell v. State,* 725 So. 2d 836 (Miss. 1998).

*Evans v. State,* 725 So. 2d 613 (Miss. 1997).

*Brewer v. State,* 725 So. 2d 106 (Miss. 1998).

*Crawford v. State,* 716 So. 2d 1028 (Miss. 1998).

*Doss v. State,* 709 So. 2d 369 (Miss. 1996).

*Underwood v. State,* 708 So. 2d 18 (Miss. 1998).

*Holland v. State,* 705 So. 2d 307 (Miss. 1997).

*Wells v. State,* 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State,* 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581 (Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989); *Shell v. Mississippi,* 498 U.S. 1 (1990) reversing, in part, and remanding; *Shell v. State*, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d 165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989); *Pinkney v. Mississippi*, 494 U.S. 1075 (1990) vacating and remanding; *Pinkney v. State*, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988); *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding; *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

*\*Jones v. State*, 517 So. 2d 1295 (Miss. 1987); *Jones v. Mississippi*, 487 U.S. 1230 (1988) vacating and remanding; *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So. 2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

*Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

**DEATH CASES REVERSED AS TO GUILT PHASE
AND SENTENCING PHASE**

*Ross v. State,* 954 So. 2d 968 (Miss. 2007).

*Flowers v. State,* 947 So. 2d 910 (Miss. 2006).

*Flowers v. State,* 842 So. 2d 531 (Miss. 2003).

*Randall v. State,* 806 So. 2d 185 (Miss. 2002).

*Flowers v. State,* 773 So. 2d 309 (Miss. 2000).

*Edwards v. State,* 737 So. 2d 275 (Miss. 1999).

*Smith v. State,* 733 So. 2d 793 (Miss. 1999).

*Porter v. State,* 732 So. 2d 899 (Miss. 1999).

*Kolberg v. State,* 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State,* 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State,* 702 So. 2d 388 (Miss. 1997).

*Howard v. State,* 701 So. 2d 274 (Miss. 1997).

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State,* 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

*Houston v. State*, 531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

**DEATH CASES REVERSED
AS TO PUNISHMENT AND REMANDED
FOR RESENTENCING TO LIFE IMPRISONMENT**

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

# DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR A NEW TRIAL ON SENTENCING PHASE ONLY

*Fulgham v. State,* 46 So. 3d 315 (Miss. 2010).

*Rubenstein v. State,* 941 So. 2d 735 (Miss. 2006).

*King v. State,* 784 So. 2d 884 (Miss. 2001).

*Walker v. State,* 740 So. 2d 873 (Miss. 1999).

*Watts v. State,* 733 So. 2d 214 (Miss. 1999).

*West v. State,* 725 So. 2d 872 (Miss. 1998).

*Smith v. State*, 724 So. 2d 280 (Miss. 1998).

*Berry v. State,* 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

*Shell v. State*, 554 So. 2d 887 (Miss. 1989); *Shell v. Mississippi*, 498 U.S. 1 (1990) reversing, in part, and remanding; *Shell v. State* 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989); *Pinkney v. Mississippi,* 494 U.S. 1075 (1990) vacating and remanding; *Pinkney v. State*, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988); *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding; *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Jones v. State*, 517 So. 2d 1295 (Miss. 1987); *Jones v. Mississippi,* 487 U.S. 1230 (1988) vacating and remanding; *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (1996).

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986); *cert. denied, Wiley v. Mississippi*, 479 U.S. 906 (1986); resentencing ordered, *Wiley v. State,* 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 F.2d 86, 105-106 (5th Cir. 1992); resentencing affirmed.

*Williams v. State*, 445 So. 2d 798 (Miss. 1984). *Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.